279 So.2d 735 (1973)
William H. WRIGHT, Individually and as the Administrator of the Estate of his minor child, Charlotte Wright, Plaintiffs-Appellants,
v.
Roy A. ROMANO et al., Defendants-Appellees-Appellants. Mr. and Mrs. Robert Cecil LORIO, Plaintiffs-Appellees,
v.
Roy A. ROMANO et al., Defendants-Appellees-Appellants. Harrison G. BAGWELL, Individually and as Provisional Tutor of the Estate of his minor daughter, Martha Sue Bagwell, Plaintiffs-Appellees,
v.
Roy A. ROMANO et al., Defendants-Appellees-Appellant.
Nos. 9298-9300.
Court of Appeal of Louisiana, First Circuit.
May 29, 1973.
Rehearing Denied July 5, 1973.
Writs Refused August 31, 1973.
*737 Wm. A. Norfolk, Taylor, Porter, Brooks & Phillips, Baton Rouge, for defendants third party plaintiff-appellant Travelers Indem. Co., Joe E. Ewell Co., Inc. and Ins. Co. of North America.
Daniel R. Atkinson, Dale, Owen, Richardson, Taylor & Mathews, Baton Rouge, for plaintiff-appellant Wm. Wright.
Richard J. Dodson and Thos. H. Benton, Benton & Moseley, Baton Rouge, for plaintiff-appellant-appellee Mr. & Mrs. Robert Lorio.
Neal N. Bagwell, White Castle, and Harrison G. Bagwell, Baton Rouge, for plaintiff-appellee H. G. Bagwell Indiv., etc.
Horace C. Lane, Baton Rouge, for third party defendant, Robert Lorio & USF&G.
Samuel J. D'Amico, D'Amico, Curet & Bush, Baton Rouge, for defendant-appellee Romano.
John J. Noland and Boris Navratil, Breazeale, Sachse & Wilson, Baton Rouge, for Fireman's Ins. Co. of Newark, N. J.
Before SARTAIN, BLANCHE and WATSON, JJ.
SARTAIN, Judge.
The accident giving rise to these three consolidated cases occurred in the Parish of West Baton Rouge at approximately 6:30 p. m. o'clock, on September 30, 1970, at the intersection of Louisiana Highway 1 and Louisiana Highway 987-3. The vehicles involved were a 1970 Chevrolet station wagon, owned and operated at the time by Roy A. Romano, and a 1969 Dodge automobile owned by Robert C. Lorio and driven by his daughter, Susan. Riding as guest passengers in the Lorio vehicle were Barbara and Robert Lorio, Martha Sue Bagwell, Charlotte Wright and Frances Fitch.
As a result of the accident, the three Lorio children were killed and the Bagwell, Wright and Fitch children were injured.
Mr. and Mrs. Lorio, Messrs. William H. Wright and Harrison G. Bagwell brought suit for the death of and injury to their respective children. Defendants are Roy A. Romano and his liability insurer, Firemen's Insurance Company of Newark, New Jersey, it being alleged that the negligence of Roy A. Romano was the sole proximate cause of the accident; Joseph E. Ewell Co., the employer of Romano; Joseph E. Ewell Frozen Foods Division, Inc., and its liability insurer, The Travelers Indemnity Company; and, The Insurance Company of North America, the excess liability insurer of the "Ewell" Corporations, it being alleged that the accident occurred while Romano was acting in the course and scope of his employment.
*738 After the date of the accident, but before anyone filed suit, Firemen's paid Miss Frances Fitch the sum of $784.80 representing medical expenses incurred by her. Subsequently, the Lorio suit was filed wherein Firemen's responded with what it termed an "Answer, Reconventional Demand and Third Party Petition for Concursus" and deposited in the Registry of the Court the sum of $49,215.20, representing the balance of the extent of their coverage of $50,000.00 on the Romano vehicle. The validity vel non of the concursus aspect of this litigation will be more fully hereinafter discussed.
The Travelers Indemnity Company and its insureds third partied the Lorios and their insurer, United States Fidelity and Guaranty Company, alleging that a proximate cause of the accident was the negligence of Susan Lorio. After trial on the merits these cases were taken under advisement and the trial judge in extensive written reasons found that Mr. Romano's negligence was the sole proximate cause of the accident, that he was acting in the course and scope of his employment with Joe E. Ewell Company, Inc. at the time of the accident; that the third party demands against the Lorios and their liability insurer were without merit, and rendered judgment as follows:
In the Lorio case (No. 9299), the trial court rendered judgment in favor of Mr. Lorio in the sum of $7,734.00 in special damages, $150.00 for property damage to his Dodge automobile, and $120,000.00 each to Mr. and Mrs. Robert C. Lorio, Sr. for the loss of their three minor children, Susan, Allyson and Robert, Jr.
In the Bagwell case (No. 9300), judgment was rendered in favor of Harrison G. Bagwell in his individual capacity in the sum of $5,430.01, and as the provisional tutor of the estate of his minor child, Martha Sue Bagwell, the sum of $35,000.00.
Mr. William H. Wright (No. 9298), was awarded judgment in his individual capacity in the sum of $11,242.38 and as the administrator of the estate of his minor child, Charlotte Wright, the sum of $55,000.00.
With respect to the concursus proceeding, the trial judge determined that the sum of $49,215.80 ($50,000 less $784.20 paid to Miss Fitch) was available to satisfy the judgment rendered in each of these cases, together with the extent of Travelers' liability of $100,000/300,000, and Insurance Company of North America (INA) (excess) in the amount of $500,000; and that the respective insurers are responsible in the order mentioned to the extent of their policy limits. Defendants, Roy A. Romano, Firemen's Joe E. Ewell Company, Inc., and Travelers were cast in solido for all costs.
In the Lorio case Joe E. Ewell Company, Inc., Travelers and INA appealed suspensively, and devolutively in the Bagwell and Wright cases. It is their contention that the trial court erred in failing to find negligence on the part of Susan Lorio, in finding that Roy A. Romano was acting within the course and scope of his employment at the time of the accident, and in awarding costs and interest in the consolidated cases and in upholding the concursus proceeding as valid.
Mr. Wright appealed devolutively contending that the award of $55,000.00 for the injuries sustained by his daughter, Charlotte, is grossly inadequate. Mr. Bagwell answered the appeal in his case urging that the award of $35,000.00 for the injuries sustained by his daughter, Martha Sue, is likewise grossly inadequate and should be increased. Firemen's answered the appeal in each of the cases submitting that the concursus proceeding was properly pursued and that it should not have been cast for costs with the remaining defendants.
Defendant-appellee, Roy A. Romano, joined with the defendants, Travelers, Ewell and INA, urging that the quantum awarded in these consolidated cases is excessive and should be reduced.
*739 Owing to the fact that these cases were consolidated for trial and though separate petitions were filed, the basic issues involved in each, save the question of quantum and the concursus proceeding, are essentially the same, we therefore shall treat these consolidated cases as one for the purpose of this opinion with a copy hereof to be filed in each case.

AS TO NEGLIGENCE AND PROXIMATE CAUSE
As stated above, plaintiffs in each of these cases argue that the sole and proximate cause of the accident giving rise to this litigation was that of Mr. Romano. The trial judge so concluded and we concur. At the scene of the accident, Louisiana Highway 1 runs in a generally north-south direction. It is a highly improved four-lane highway with two lanes for each direction of travel, separated by a grass median. Louisiana Highway 987-3 runs in a generally east-west direction. It is also an improved highway of appropriate construction and shoulders. It is inferior to Louisiana Highway 1 in that there is a stop sign which must be adhered to by east and westbound traffic as it relates to Louisiana Highway 1. Neither the surviving children in the Lorio vehicle nor Mr. Romano, because of post traumatic amnesia, can recall the events leading up to the accident. From the physical evidence and that of other witnesses, it is quite apparent that the driver of neither vehicle saw the other until a fraction of a second before impact. Mr. Romano failed to heed the stop sign located at the southwest corner of the intersection, traversed the two lanes on Louisiana Highway 1 for southbound traffic, the width of the median, and struck the Lorio vehicle broadside at a point near the center line for the two lanes of travel for northbound traffic on Louisiana Highway 1. There were approximately thirty-four feet of "scuff" marks commencing at the point of collision and leading to the west from whence Mr. Romano was traveling.
Three witnesses observed one or the other of the two vehicles but not both until the moment of impact. The speed of the Lorio and Romano vehicles was each estimated to be between 35 and 45 m. p. h., well within the allotted speed limits. The evidence is clearly supportive of the conclusion that for some unexplained reason Mr. Romano failed to stop before crossing Louisiana Highway 1. There is no evidence in the record to support the contention that Susan Lorio should have seen Mr. Romano and determined that he was not going to yield the right of way to her, thereby giving her the opportunity to avoid the accident. It would be pure speculation on our part to venture an opinion as to why Mr. Romano did not see the Lorio vehicle and he, because of his injuries, was unable to explain his failure to adhere to the stop sign. The question of Mr. Romano's negligence under these circumstances is relatively easy to resolve. Contrary to statutory law, he failed to stop and proceeded to cross Louisiana Highway 1. This negligence was the sole and proximate cause of the accident and the ensuing deaths and injuries. See Steiner v. Employers Liability Assurance Corp., 182 So. 2d 345 (3rd La.App.1966); Barrett v. State Farm Mutual Automobile Insurance Co., 236 So.2d 900 (3rd La.App.1970); Phoenix of Hartford Insurance Co. v. Llort, 219 So.2d 789 (1st La.App.1968); American Insurance Company v. Speights, 206 So.2d 295 (1st La.App.1968).
Assuming, arguendo, that Miss Susan Lorio should have seen the Romano vehicle, the burden of proving such rests with the defendants and they have failed to bear this burden. We have reviewed carefully the testimony of the witness following the Lorio vehicle and even this witness did not discern the presence of Mr. Romano's automobile until it had undoubtedly crossed a portion of the southbound lanes of traffic on Louisiana Highway 1 and the neutral ground. The dismissal of defendants' third party claim against Mr. Lorio and his liability insurer was proper.

*740 COURSE AND SCOPE OF EMPLOYMENT
Probably the most seriously contested aspect of this litigation is the question of whether Mr. Romano was within the course and scope of his employer's business when the accident occurred.
In February of 1970 Mr. Romano was employed by Joe E. Ewell Company, Inc. at a salary of $500.00 per month. His employer is a promotional representative of various large food distributors. It employs representatives to call upon various food retail outlets for the purpose of assisting these outlets in the display and promotion of the food manufacturers it represents. Mr. Romano was not a salesman, he was more of a public relations, contact, or good will representative of the manufacturer through his employer. He was required to furnish his own automobile. In the instant case he was given an allowance of $100.00 per month towards the cost of an automobile. All gas purchases were paid by the employer. If for any reason the vehicle was used for personal reasons, Mr. Romano was to remit to his employer the sum of three cents per mile for such personal use. It is undisputed that his employer preferred that his representatives use a station wagon. This permitted them to carry display items and other sales promotional material. The rules of the company admonished its employees to keep the vehicle in a clean and tidy condition so that it would reflect favorably upon the company. It was under these conditions that Mr. Romano purchased the station wagon which was involved in the accident.
Company rules further provided that an employee would commence work at 8:00 A.M. in the morning and continue to call on retail outlets until 5:00 P.M. in the afternoon. Mr. Romano, as other similar employees, was required to render a daily report setting forth the various stores he had called upon, mileage, and time of departure from and return to his residence. The company had no office in Baton Rouge and Mr. Romano actually operated out of his home. The daily reports were completed upon his return to his home in the afternoon and then placed in the mail the next morning for his employer.
On September 30, 1970, Mr. Romano called upon National Food Store No. 10 located in New Roads, Louisiana. He left the store between 4:00 and 4:30 p. m. and instead of returning to Baton Rouge on Louisiana Highway 1, he decided to go to his camp located on the Island side of False River, across from New Roads. He remained at his camp or its vicinity approximately an hour before he commenced his journey home. It is uncontested that his camp is not on the nearest or direct route home and that at the time he was at his camp or the particular road on which it is situated, he had deviated from his route and for that period of time was not in the course of his employer's business. However, on his return home he drove directly to U. S. Highway 190 and turned east thereon. U. S. Highway 190 is on his direct route home and we hold that upon his reaching this highway he re-entered his employer's business and was therefore acting in such a manner as to invoke the doctrine of respondeat superior and render his employer liable for his negligence.
Whereas, Mr. Romano had made several trips to New Roads he had never returned by using Louisiana Highway 987-3 from U. S. Highway 190 to Louisiana Highway 1 and he could not explain his reasons for doing so on this occasion. Nonetheless, the use of this road for the first time, which would lead him to Louisiana Highway 1, which he intended to take, is immaterial for the reason that there is little, if any, difference in mileage between the use of this road and the one Mr. Romano normally took to reach Louisiana Highway 1.
Defendants have cited numerous authorities involving the issue of whether or not an employee was acting within the course and scope of his master's business in returning to and from work or in making *741 business trips in response to a request of the employer where the employee made certain deviations from the route proposed that he should take. A careful reading of the cases relative to this subject matter discloses that there is not nor can there be any hard and fast rule acceptable as a criterion in every case. Each case must be decided largely on its own facts, keeping in mind that for the employer to be responsible, the employee must have been in the service of or about his employer's business or being used in such a manner as to benefit the business of the employer. In O'Brien v. Traders and General Insurance Company, 136 So.2d 852 (1st La.App., 1961) an employee was paid on a mileage basis, whether he traveled by private or public conveyance. He was to come to Baton Rouge from his home in Winnsboro on a Monday morning. He left his home the evening before where he spent the night as a guest in the home of his mother-in-law, in Simpson, Louisiana. The next afternoon he resumed his journey to Baton Rouge in the course of which he was involved in an accident within 25 miles of his destination. We concluded that though the employee had taken a longer route, he was within a reasonable distance of his destination and therefore was about his employer's business when the accident occurred. See 14 T.L.R. 72 which details with particularity, including illustrative diagrams, various decisions involving the matter of deviation and the doctrine of re-entry.
Counsel for Travelers, et al. argues very strenuously that the case at bar not only involves a deviation in route but also in time and that had it not been for this deviation in time, Mr. Romano would not have been at the intersection of Louisiana Highway 1 and 987-3 at the crucial moment. Inasmuch as we have concluded that there was no deviation in route, we turn to the question of whether there was a deviation in time. Mr. Romano left New Roads for his camp between 4:00 and 4:30 p. m. He left his camp for home at approximately 5:45 p. m. so we have a period of an hour and 30 minutes to an hour and 45 minutes. Counsel argues that this deviation in time is sufficient to place Mr. Romano outside of the course of his employment and cites Dragon v. Fisher, 244 So.2d 347 (4th La.App.1971) and Blade v. Mervis, 226 So.2d 552 (4th La.App.1969). The facts in the cited cases are clearly distinguishable from those in the case at bar. Mr. Joe Ewell testified that Mr. Romano violated no company policy, rule or regulation when he decided to go by his camp. He would be expected to reimburse his employer the three cents per mile charged for the personal use of the vehicle. In Dragon the employee, after working hours, left his home in his own automobile to go to the store to purchase clothing at his own expense. The court properly held that under these circumstances the employee was not about his master's business. Blade is a suit for workmen's compensation benefits. There the employee remained at his employer's place of business from 1:30 p. m. to 4:30 p. m. to participate in a card game for his own pleasure. The Court properly concluded that R.S. 23:1031 precluded recovery because the incident which gave rise to his claim occurred well after a reasonable time in which an employee is permitted to prepare for leaving his employer's premises. Plaintiff contended that there was a Christmas party for the benefit of the employees. Neither the trial court nor the Court of Appeal accepted his version of the "party".
We now turn to the question of quantum.

QUANTUM IN LORIO
As stated above, the trial judge awarded Mr. and Mrs. Lorio each $40,000 for the death of each of their three children. These were all of their children.
We are quite cognizant of the argument advanced by all of the defendants who contend that this award is the highest to be found in a case study involving awards for *742 loss of love and affection for minor children. In Luttrell v. State Farm Automobile Insurance Company, 244 So.2d 97 (3rd La.App.1971), a mother was awarded $20,000 for each of her two minor children killed in an automobile accident. There were two other children in the family. In Murphy v. Martinez, 245 So.2d 1 (1971), this court awarded $10,000 to each parent for the death of their eight year old son. In Comeaux v. Dupuis, 254 So.2d 687 (3rd La.App.1971), the mother was awarded $11,000 for the death of her seven year old mentally retarded child. There were two other surviving children in the family. In Boudreaux v. Allstate, 258 So.2d 710 (3rd La.App.1972), an award of $15,000 was made to each parent for the death of their eleven year old son. There were other brothers and sisters in the family at the time. In Keaton v. Transit Casualty Company, 263 So.2d 484, (1972), this court awarded $35,000 in favor of the parents for the death of two children. A similar sum had been obtained by compromise from a co-defendant. Thus, the total award for the loss of these two children amounted to $70,000. In Lopitz v. Louisiana Department of Highways, 268 So.2d 269 (4th La.App.1972), each parent was awarded the sum of $20,000 for the loss of love and affection due to the death of their three year old son. He was not the only child but the court pointed out he was the couple's youngest child.
In Poston v. Firemen's Fund Insurance Company of Newark, New Jersey, 256 So. 2d 700 (2nd La.App.1972), writs refused 260 La. 1122, 258 So.2d 376, a mother was awarded $35,000 for the death of her nineteen year old son. In upholding this award the Court of Appeal for the Second Circuit emphasized that the son lived with his divorced mother and they worked for the same employer. The court also stated that the young man was an industrious youth with a bright future and had a very close relationship with his mother. Lastly, in Sylvester v. Liberty Mutual Insurance Company, 245 So.2d 497 (3rd La.App.1971), writs refused, 258 La. 579, 247 So.2d 395, our brethren of the Third Circuit reduced an award of $30,000 for each parent of each of two children who died as a result of an automobile accident to an award of $20,000 per parent per child. In Sylvester, the court relied heavily on Womax v. Earl Gibbon Transport, Inc., 226 So.2d 573 (4th La.App. 1969), in which a jury award of $50,000 for each parent for the death of a twenty year old son was reduced to $20,000 per parent.
Without question the above cases have been cited to support the proposition that awards in similar cases may be used to determine whether or not a trial judge or jury abused the considerable discretion vested in them in the assessment of damages. C.C. Art. 1934(3). Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963); and Ballard v. National Indemnity Co., 246 La. 963, 169 So.2d 64 (1964).
We have examined the above cited cases and in addition have made an extensive review of many cases involving the award to a parent for the loss of a child. We feel it safe to say that in none of the cited cases or those that we have reviewed are the facts remotely apposite to the tragedy which occurred in the instant case. In one fleeting moment Mr. and Mrs. Lorio lost every one of their children. The question is asked, is the loss here any greater because the Lorios lost all of their children? Would it have been less had only one or two of the children been taken from them? Is it more significant than losing an only child? Reason compels us to answer in the affirmative. As severe as any loss may be to a family where only one of several children is taken by death, whatever the cause, that loss of love and affection can be tempered by the love and affection a parent may find in the remaining children. Here, Mr. and Mrs. Lorio can find no such consolation or relief.
We do not hold that, standing alone, the award rendered in this case is *743 approved simply because they lost their entire family. For the measure of damages is the loss of love and affection and in this case the record is without equal in its portrayal of the unity, mutuality of interest, devotion, consideration and respect these three children showed to their parents and their parents to them. Mr. Lorio operates a western wear and livery business. His two older children, Susan (age sixteen), and Allyson (age thirteen), worked in this business with him. The family's entire interest was devoted to this business plus the recreational aspects of horse shows and competitive riding. From the time each of the children was physically able to sit on a horse, they and their parents devoted their leisure time to this common interest. The accomplishments of the older children were a source of considerable pride to the parents. There can be no doubt but that these activities drew this family together and strengthened the natural ties that bind parent to child. Further, this common interest was shared by the family with other youths and the Lorio home, store, and riding facilities were always available to and enjoyed by their mutual friends, both young and old.
The record further reflects that each of these children was exceptional in school, courteous to their teachers and obedient to their elders. Again, these attributes can only deepen the love and affection these parents held for their children and make their loss even greater.
Therefore, it is with full cognizance of all these factors that we have no hesitancy in affirming the award of the trial court.
The sum awarded to Mr. Lorio for special damages is not contested.

QUANTUM IN WRIGHT
As stated above, the trial judge awarded $55,000 for the injuries sustained by Charlotte Wright (age fourteen). In assessing damages the trial court found that she had sustained a severe cerebral contusion; comminuted fracture of the pelvis; fractures to the right scapula and the neck of the right humerus; multiple fractured teeth; multiple lacerations of the face; an eight inch laceration of the scalp; multiple contusions and abrasions about her whole body. Dr. Robert C. Leaver, a neurosurgeon, testified that a cerebral contusion is equated to a bruise of the brain. He saw her very shortly after the accident and there was no evidence of blood clots on the brain. He prescribed treatment with steroids to preclude the possibility of any associated brain slowing. This type of treatment was discontinued on October 2, 1970. A post traumatic electroencephalogram was performed on March 5, 1971 and because it was abnormal, it was this witness' opinion that due to Miss Wright's severe head injuries, she stood an eight to twelve percent chance of suffering post traumatic epilepsy. He further stated that the drastic personality changes observed in this youth following the accident were compatible with the head injuries. Associated with this problem is the mental deficiency noted following the accident. Miss Wright's principal testified that tests given to her in the seventh and eighth grades indicated that she possessed average to low average academic ability, but that the tests given following the accident showed a drastic drop which would place her well below average. The test given to substantiate this finding is known as The National Educational Development Test. This witness further testified that he had observed a drastic change in the child's personality. Before the accident she was a normal and rather independent individual. Following the accident she was most dependent on others and very insecure. The record clearly preponderates to the conclusion that the personality change was the result of the accident. This was the testimony of her family and friends and was fully medically corroborated by her family physician.
Dr. Willard Dowell was called in for orthopedic consultation and from his viewpoint the fractures of her pelvis were the *744 most serious. He recommended, after consultation with two other specialists, that the fractured pelvis be manipulated under general anesthesia and that Miss Wright be placed in an immobilizing cast. However, due to her general condition and serious head injuries, her attending physician concluded that she could not undergo a general anesthesia and the orthopedic recommendations were deferred. As a result, the pelvis healed with a slight deformity of the hips and a resulting ten percent disability of the body as a whole with a fifteen percent limitation of motion of the right hip. However, the most serious aspect of the pelvic injury is that because of a fetopelvic disproportion, Miss Wright will not be able to give normal birth to a child and the only alternative is to deliver by Caesarean section. This opinion was concurred in by Dr. O. M. Thompson, the family physician who is recognized as an expert in the field of obstetrics. Dr. O. M. Thompson testified that he was originally called by Mr. Wright and acted as the treating physician. It was he who called in the various experts who testified. Dr. Thompson stated that Miss Wright had multiple lacerations to her face which were relatively small and were sutured in the emergency room, she had two lacerations of the scalp, one of which was approximately eight inches in length running from the middle of her head to her ear which, in effect, scalped one-half of her head.
Dr. Redfield Bryan, an expert in the field of urology, examined her on the morning following the accident and found that the bladder had suffered a significant contusion due to the pelvic fractures. A catheter had been inserted and she had grossly bloody urine. However, x-rays disclosed that the bladder had not been ruptured. He recommended conservative treatment and antibiotics. Miss Wright remained catheterized for two weeks and Dr. Bryan confirmed that there is an unusual amount of discomfort associated with a catheter. Further, the use of the catheter for any great length of time increases the possibility of chronic cystitis.
Dr. Gayle Monget, a dental surgeon, testified that Miss Wright's four lower anteriors were fractured through the enamel; that the two lower cuspids were fractured; and, the first and second lower right bicuspids were fractured well below the gum line. Also, the lower six-year molar had the cusp broken. While this young lady was in the hospital he administered medication to relieve pain and made temporary wire splints for the first and second bicuspids. Following hospitalization, Miss Wright was seen by Dr. Monget on a number of occasions. Root canals were performed and porcelain jacket crowns were made to restore the fractured teeth. Dr. Monget also stated that future dental work would be necessary and estimated the cost thereof to be $855.00.
Miss Wright remained in the hospital from September 30, 1970 to October 17, 1970. She was confined to her home until December 8, 1970, when she was finally able to return to school on a part-time basis.
For these injuries the trial judge awarded the sum of $55,000. As stated above, Mr. Wright and the defendants appealed, one contending the award was inadequate and the latter urging that the award was excessive. While recognizing that a trial judge's award for damages should not be altered on appeal unless there is a clear showing that he abused the discretion accorded to the trier of fact in such matters, we must hold that the award herein does not adequately compensate Miss Wright for the three serious residual disabilities she has sustained. First, the personality change occasioned by the accident showed no signs of improvement by the time of the trial some twenty-five months later. Second, the mental deficiency was proved beyond any doubt and it, too, showed no signs of improvement and must be considered as permanent. Third, the inability of this young lady to bear children normally is a direct result of the accident and she will be forced to submit to major surgery for each child, with the *745 risks attendant thereto. For these reasons, we believe that the award should be increased from $55,000 to $85,000.
The award to Mr. Wright for special damages was in the sum of $11,242.38. This award included $855.00 for future dental expenses and $2,000 for future medical expenses. The only evidence in the record with respect to future dental and/or medical expenses is that of Dr. Monget and his testimony is clear to the effect that in his judgment additional dental expenses will amount to $855.00. This amount should be approved. However, the award of $2,000 for future medical expenses is not justified by the evidence adduced during the course of the trial. The award of such an item is a special award and the necessity for future medical treatment must be within the realm of reasonable probability. While Miss Wright did sustain very serious injuries as above enumerated, there is no evidence that any of these injuries will require further medical attention. Therefore, the award of $11,242.38 should be reduced by the sum of $2,000.00.

QUANTUM AS TO BAGWELL
Miss Martha Sue Bagwell was fourteen years of age at the time of the accident. She sustained a severe cerebral contusion and concussion and remained unconscious for approximately five days. As a result of these injuries, she continues to suffer severe headaches and originally had some difficulty in carrying out her ordinary school work. However, at the time of the trial her headaches had subsided somewhat and she was doing excellent school work. A post-accident electrocardiogram evidenced normal results. Apparently, she has sustained no residual damage as a result of the brain contusion. When she was brought into the Emergency Ward of the hospital she was at "death's door". The attending physician at the time was unable to register any blood pressure. Relatively normal blood pressure was restored by blood transfusions prior to the spleenectomy. She was cold to touch, pallid in color and in a state of severe shock. She was examined by Dr. Thomas B. Flynn, a neurologist, who concluded that her condition of shock was caused by the loss of blood and not the head injuries. The attending physician discerned that Miss Bagwell had sustained a severe injury to the spleen which had to be surgically removed. This spleenectomy resulted in a scar eight or nine inches in length from her breast area to slightly below her naval. She sustained other internal injuries consisting of lacerations of the middle portion of the liver and to the kidney. Severe internal bleeding in her chest area resulted in lung congestion. She also suffered fractures to her seventh, eighth and ninth ribs. Additionally, she sustained multiple fractures of the pelvis, the left sacroiliac joint, and the left acetabulum. This has resulted in limiting her recreational activities and the possibility of arthritis in the sacroiliac area. She received a severe blow to the left side of her face, eye and temporal area, with ecchymosis of the left eye which lasted for approximately one month. It is complained that this has required corrective glasses. Further, Miss Bagwell sustained a two inch laceration and scar above the left instep, a three inch laceration and scar on the left shoulder, a seven inch laceration and scar on the right thigh with two smaller scars measuring one-half to three-quarters of an inch each.
Dr. J. Willard Dowell, an orthopedic specialist, stated that his examination of Miss Bagwell revealed a fracture of her pelvis adjacent to her left sacroilliac. Because of the spleenectomy and the child's general condition, normal orthopedic procedures following fractures of the pelvis were not followed. This has resulted in some displacement of the pelvis. However, Dr. Dowell did not believe that this fetodisproportion would prevent normal child delivery. No obstetrics specialist expressed an opinion on this point and we must conclude that this youth's ultimate ability to bear children is not impaired.
*746 Miss Bagwell remained in an unconscious condition in the hospital for four days. Upon her release she was confined to bed at home for two weeks. The injuries to her hip required that she use two crutches for an additional six weeks and one crutch for the next six weeks. She was able to return to school on a limited basis in December. It is believed that the removal of the spleen will not present a residual problem save for the normal function of that organ and its use to the body as a whole.
The difficulty Miss Bagwell has complained of relative to the injury to her left eye was not corroborated by any medical testimony as no expert testimony was offered with respect to this aspect of her injuries.
At the time of the trial she was still experiencing occasional headaches, pain upon physical exertion, such as riding a horse, or sitting in one position for a long time, such as riding on a school bus, etc. It is agreed that the fractures to the pelvis would make her more susceptible to posttramatic arthritis. Considering all of these injuries, we do not find that the award of $35,000 is either excessive or inadequate and well within the discretion of the trial judge.
The award to Mr. Bagwell for special damages in the amount of $5,430.01 is fully supported by the record and we concur in the same.

CONCURSUS PROCEEDING
In order to better understand the issues raised relative to the concursus proceedings invoked by Firemen's Insurance Company of Newark, New Jersey, certain dates are pertinent, to-wit: the Lorio suit was filed on February 4, 1971, the Wright suit was filed on March 17, 1971 and the Bagwell suit was filed on May 14, 1971. In response to the Wright suit, Firemen's filed on March 8, 1971 what has been hereinabove referred to as "Answer, Reconvention Demand and Third-Party Petition for Concursus," Paragraph 7 of that proceeding reads as follows:

"Without admitting any liability on the part of Roy A. Romano for the accident in question, petitioner, Firemen's Insurance Company of Newark, New Jersey, wishes to avail itself of the concursus provisions of the Louisiana Code of Civil Procedure and pay the limits of its policy into court and be discharged from further liability in the premises. Petitioner shows that it has heretofore paid to Mrs. Mary Stokes Fitch, mother of the minor, Francis S. Fitch, the sum of $784.80 to cover medical expenses incurred by her in connection with the treatment of the injuries sustained by her minor daughter, leaving as a balance of the bodily injury limits of petitioner's insurance policy the sum of $49,215.20 which petitioner has caused to be deposited in the registry of this court concurrently." (Emphasis ours)
The record further reflects that by agreement of all counsel it is stipulated that these three suits would be consolidated for trial and that the petition for a concursus proceeding would be heard at the same time.
Counsel for appellant, William H. Wright, contests the validity of the concursus proceeding on the grounds (1) that Firemen's did not admit liability and (2) it failed to deposit the full sum of its exposure of $50,000, having deducted the sum of $784.80 which was previously paid to cover medical expenses incurred by Miss Frances Fitch. The trial judge upheld the validity of the concursus proceeding and prorated the sum deposited by Firemen's in various amounts to the parties named in the petition for concursus. Counsel contends that the trial court erred in upholding the validity of the concursus proceeding and that interest should accrue on the judgment ultimately obtained from the date of judicial demand until paid. Firemen's has answered the appeal and argues that the *747 concursus proceeding was proper and its validity should be upheld by this court. However, Firemen's objects to that portion of the decision of the trial judge which held it responsible in solido with the remaining defendants for court costs. It argues that once it deposited funds in the registry of the court it should be relieved of all liability for any court costs as these costs should be satisfied out of the funds placed on deposit.
We are of the opinion that the concursus proceeding was properly invoked and that judgment of the District Court casting Firemen's in solido with the remaining defendants for all costs was proper and should also be affirmed.
In examining the validity of the concursus proceeding it is noted that C.C.P. Art. 4652 provides in pertinent part:
"No person claiming damages for wrongful death or for physical injuries may be impleaded in a concursus proceeding, except by a casualty insurer which admits liability for the full amount of the insurance coverage and has deposited this sum into the registry of the court." (Emphasis ours)
Firemen's argues that it could not admit liability for its assured, Mr. Romano, as the same would be contrary to its policy provisions which guaranteed Mr. Romano legal representation in these proceedings where it was probable that he would be cast in judgment in excess of the policy limits. We believe the position taken by Firemen's in this regard is correct. It placed its available proceeds at the disposal of the court for distribution to all claimants. It could not with one hand admit liability and on the other hand see that the interests of Mr. Romano were not jeopardized.
The trial judge in awarding Miss Fitch the amount of $2,500 took into account the previous payment on her behalf in the sum of $784.80 but determined that her pro rata share in the concursus funds was less than the amount paid so she was not permitted to participate further in the distribution of these funds.
We do not find that the payment of $784.80 precluded Firemen's from invoking a concursus proceeding for the purpose of determining the pro rata share due the remaining defendants. We find no case squarely in point. In State Farm Mutual Automobile Insurance Company v. Ray, La.App., 161 So.2d 148, the liability insurer endeavored to avail itself of the provisions of C.C.P. Art. 4651 et seq, it admitted liability, and deposited the sum of $20,000, the extent of its limit under one policy, but at the same time it sought declaratory relief with respect to liability under another policy issued to its insured. In connection with the prayer for declaratory relief the plaintiff argued that the defendants were estopped from prosecuting other claims relating to the accident because they had withdrawn the funds deposited. The court, in essence, held that the concursus proceeding was conditioned upon the release of other claims and was not a real tender requisite to exonerating the debtor from the debt and legal interest.
The question presented here is whether an insurer may make certain payments to a potential claimant and then avail itself of concursus benefits by depositing the balance of its available funds with the court.
We believe that the situation here is analogous to the circumstances where a liability insurer has entered into a compromise settlement with one claimant which the courts have recognized does not increase the insurer's exposure when other claimants endeavor to secure the full amounts of the stated policy limits in a subsequent law suit. In Richard v. Southern Farm Bureau Casualty Insurance Company, 254 La. 429, 223 So.2d 858, our Supreme Court recognized that compromises are favored in law and that a liability insurer should not be held liable beyond policy limits to a claimant by reason of the fact that the insurer entered into a reasonable *748 compromise settlement with other claimants.
Similarly, we deem it equally important for an insurer to be able to pay reasonable medical expenses of a claimant and not thereby jeopardize the limits of their exposure by doing so. As stated in Richard, the test is whether or not the compromise was entered into in good faith and was a reasonable one. In the case at bar the question should be whether the payment of $784.80 to defer Miss Frances Fitch's medical expenses was done in good faith and reasonable under the circumstances. To hold otherwise would virtually end any possibility of an insurer paying medical expenses of a potential claimant however dire the circumstances may be.
We believe that the deposit of funds equaling the amount of insurance coverage less those sums utilized to effect a compromise and/or pay medical expenses of a claimant, where such expenditures are made in good faith and in a reasonable manner, is compatible with and satisfies the requirements of C.C.P. Art. 4652, supra.
The remaining issue with respect to the concursus proceedings is the claim of Firemen's that it should not be held in solido with the remaining defendants for the court costs incurred in this litigation. We find this contention incompatible with the "Supplementary Payments" provision contained in Part I of the policy issued by it to Mr. Romano, which provision reads as follows:
"To pay, in addition to the applicable limits of liability:
(a) all expenses incurred by the company, all costs taxed against the insured in any such suit and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the company has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the company's liability thereon;
(b) premiums on appeal bonds required in any such suit, premiums on bonds to release attachments for an amount not in excess of the applicable limit of liability of this policy, and the cost of bail bonds required of the insured because of accident or traffic law violation arising out of the use of an automobile insured hereunder, not to exceed $100 per bail bond, but without any obligation to apply for or furnish any such bonds;
(c) expenses incurred by the insured for such immediate medical and surgical relief to others as shall be imperative at the time of an accident involving an automobile insured hereunder and not due to war;
(d) all reasonable expenses, other than loss of earnings, incurred by the insured at the company's request." (Emphasis ours)
It is Mr. Romano who is being taxed for costs. Mr. Romano is Firemen's insured and if Mr. Romano is liable therefor, which he is, so is Firemen's.
The complaint of Travelers, etc., relative to the judgment of $2,500 in favor of Miss Fitch appears to have been satisfied by the rendition and signing of a corrected judgment by the trial judge.
Accordingly, for the above reasons, the judgment rendered in the above captioned causes, William H. Wright, etc., Vs. Roy A. Romano, et al, No. 9298, is amended by reducing the award to Mr. Wright, individually, from $11,242.38 to $9,242.38 and by increasing the award to Mr. Wright as the administrator of the estate of his minor child, Charlotte Wright, from $55,000 to $85,000; in Mr. and Mrs. Robert Cecil Lorio Vs. Roy A. Romano, et al, No. 9299, the judgment is affirmed; in Harrison G. Bagwell, etc., Vs. Roy A. Romano, et al, No. 9300, the judgment is affirmed.
The judgment of the trial court dismissing the third party demands against Robert *749 C. Lorio and United States Fidelity and Guaranty Company is affirmed.
The judgment pro rating the concursus funds is affirmed.
The above judgments shall be satisfied in the following order: (1) from the concursus funds as pro rated, (2) by Travelers Indemnity Company to the extent of its liability, and (3) by the Insurance Company of North America to the extent of its liability, together with interest at the legal rate with respect to Roy A. Romano, individually, Joseph E. Ewell Company, Inc., Travelers Indemnity Company and Insurance Company of North America from the date of judicial demand until paid. In all other respects the judgment appealed from is affirmed. The defendants, Roy A. Romano, Firemen's Insurance Company, and the Travelers Indemnity Company are cast for all costs of these proceedings.
Amended and as amended affirmed.