DOMENGEAUX, Judge.
This suit for damages arise from an automobile accident which occurred in a light rain on January 3, 1979, at about 6 P.M. in Vermilion Parish. Plaintiff, Elite Vallot, was negotiating a left turn into her daughter’s driveway from Highway 167 between Abbeville and Maurice, when her 1977 Buick was violently struck by a pickup truck attempting to pass her. The 68 year old Mrs. Vallot suffered serious injuries as a result of the accident.
The pickup truck which struck plaintiff’s car was driven by Kenneth E. Combs, owned by Cameo, Inc., and insured by North-West Insurance Co. Combs, Cameo, and North-West were named as defendants in this suit filed by Mrs. Vallot to recover damages for personal injuries, medical expenses, lost wages, and property damage sustained as a result of the accident.
Following a non-jury trial held February 20 and 22, and May 20, 1980, the district judge found that the accident was caused by the negligence of the defendant Combs and awarded plaintiff general damages of $65,000.00, special damages of $17,800.06, and lost wages of $15,000.00. Accordingly, *982 the judge signed the judgment against all defendants, Combs, Cameo, and NorthWest, jointly, severally, and in solido in the amount of $97,800.06 at 7% interest from March 7, 1979. Defendants have appealed. We affirm.
NEGLIGENCE
The duties and rights of a left-turning motorist with respect to overtaking traffic were set forth by this Court in Petite v. Richardson, 347 So.2d 23 (La.App. 3rd Cir. 1977), and were reiterated in Aetna Insurance Company v. Southern Farm Bureau Casualty Insurance Company, 347 So.2d 924 (La.App. 3rd Cir. 1977) as follows:
“It is well established in the jurisprudence of this state that a motorist who attempts to make a left turn from a public highway is required to ascertain in advance that the way is clear and that the turn can be made safely and without endangering overtaking or oncoming traffic. The failure of a left turning motorist to make such a determination and to exercise the required degree of caution before undertaking to make such a turn constitutes negligence. Sonnier v. Hardware Mutual, 242 So.2d 900 (La.App. 3rd Cir. 1971). The duty of the left turning motorist is two-fold, first to give a proper signal, and secondly to make proper observation that the turn can be made without endangering oncoming or overtaking vehicles. Bamburg v. Nelson, 313 So.2d 872 (La.App. 2nd Cir. 1975).
It is likewise well established that a motorist in judging whether a left turn can be made in safety has the right to assume that the following traffic will observe all the duties imposed upon it by law and common sense and is keeping a proper lookout. Faulkner v. Ryder Tank Lines, Inc., 135 So.2d 494 (La.App. 2nd Cir. 1961) writs denied February 2, 1962; Worley v. Heinen, 280 So.2d 301 (La.App. 1st Cir. 1973) writs refused September 14, 1973.”
Based upon the testimony of the eyewitnesses who were following Mrs. Val-lot, and upon the above principles of law, we believe the issue of negligence is easily decided in plaintiff’s favor.
Shortly before this accident occurred, Mrs. Vallot, Combs, and several eyewitnesses were located about two miles north of Abbeville and were slowly traveling north in their respective automobiles towards Maurice on Highway 167, a two-lane highway. It was not completely dark, but most of the vehicles, including those driven by Mrs. Vallot and by Combs, had their headlights turned on.
Following Mrs. Vallot was Alfred Bousta-ny, a 26 year old attorney who was driving a small car. He testified he was 20 to 30 feet behind plaintiff when she began her left turn. He had contemplated passing Mrs. Vallot because she was driving so slowly, but reconsidered when he saw her left turn signal begin to flash 100 to 150 feet before she began her left turn. He first became aware of Combs’ pickup truck when it was even with his car. He estimated Combs was traveling 65 to 70 miles per hour in a 55 mile per hour speed zone, while his own speed he estimated to be 35 miles per hour just before the accident.
Ten feet behind Boustany’s vehicle was a 1958 rice truck being driven by Jeffery Faulk, 18. Faulk recalled seeing plaintiff’s left turn signal begin blinking about 200 feet from the accident site. His view was not obstructed by Boustany’s vehicle because he could see over the top of the smaller car ahead of him. According to Faulk, plaintiff had already begun her left turn when the defendant passed him by at a speed in excess of 55 miles per hour.
Fifty feet behind Faulk’s rice truck was 18 year old Cordell Broussard, who was driving a 1975 Chevrolet Caprice Classic. Broussard testified that Combs was trailing his Caprice by 20 to 30 feet when the defendant pulled into the left lane to begin his passing maneuver. He estimated defendant’s speed at 60 to 65 miles per hour. Broussard was unable to see whether Mrs. Vallot had her left turn signal on because his view was obstructed by Faulk’s rice truck, but he did witness the accident because it occurred in the left lane.
*983 Kenneth Combs testified that he was only IV2 to 2 car lengths away, or about even with Boustany’s automobile, when plaintiff began turning left. The front end of her car had just cleared the left edge of the paved portion of the highway, and was pointed directly at the driveway, when he smashed into her car at 65 miles per hour, propelling both vehicles into the ditch next to the west or left-hand shoulder of the highway. Evidentiary photographs vividly reveal that plaintiff’s car was struck in the middle of the driver’s side. Additionally, Combs testified that a light rain had been falling, that he had consumed three beers within an hour or two of the accident and that he began his passing maneuver despite the presence of a solid yellow line in the northbound lane of traffic. Combs acknowledged that the solid yellow line meant that passing was prohibited at that point.
Lona Sellers, plaintiff’s daughter and a passenger in the front seat of plaintiff’s car, testified that her mother had just begun to turn when she (Lona) turned around to wake up her two small sons, who were sleeping on the back seat of plaintiff’s car. She saw defendant’s truck bearing down on her mother’s car when it was about five car lengths away. However, she did not say whether she told her mother she saw the truck. She also testified that her mother put her left turn signal on about six feet before the driveway.
Plaintiff testified that she activated her left turn signal well before the point at which she intended to turn. Before she began her turn, she came to a complete stop, looked to her rear but saw no one attempting to pass, and then proceeded to turn into her daughter Lona’s narrow driveway when the truck hit her side of the car. She never saw the truck. From that point, she said, she remembered nothing until about February 7, 1979, two weeks after she had been discharged from the hospital.
Each party expended considerable energy and effort in an attempt to prove or disprove the presence of a solid yellow line in the northbound lane at the point of the accident and at the time of the accident. Most of the eyewitnesses, including the defendant Combs, remembered seeing a solid yellow line in the northbound lane. The defendant introduced photographs of the accident scene taken by an insurance adjuster three days after the accident occurred. The photographs belie the testimony of the eyewitnesses that a solid yellow line existed in the northbound lane at the point of the accident.[1] However, the photographs do not rule out the presence of a solid yellow line in the northbound lane south of the accident site, where the defendant began his passing maneuver, because all of the photographs of the accident site were taken from points a short distance south of the accident site and include that portion of Highway 167 north of the accident site.
The trial court did not draw any conclusion as to whether or not a solid yellow line existed in the northbound lane at the point of impact at the time of the accident, but he did conclude that the defendant had begun his passing maneuver when there was a yellow line in his lane. Combs testified to that fact and several witnesses remembered seeing a yellow line in their lane of travel. The defendant later contradicted this testimony but the court found that this latter testimony lacked credibility. Furthermore, defense counsel offered no photographs to prove that the point at which Combs began his maneuver (anywhere from 400 feet to % of a mile before the accident site, according to Combs’ testimony) was free of the prohibitory yellow line. Thus, the evidence supports the court’s conclusion that Combs ignored the prohibition against passing when he sought to overtake the string of slow-moving vehicles.
The court found the testimony of plaintiff’s witnesses to be more believable than the testimony of either Combs or the *984 witnesses called on his behalf. Based on his comments at the conclusion of the defendant’s evidence, the court concluded that defendant Combs initially crossed the yellow line in his lane, that he was driving at a rate of speed which exceeded the posted speed limit and which was excessive because the road was wet, and that this conduct amounted to negligence. This finding is not manifestly erroneous because it is amply supported by the evidence.
Since the court rendered judgment in plaintiff’s favor, we must conclude that he felt the evidence satisfactorily demonstrated that Mrs. Vallot performed the twofold duty required of left-turning motorists —1) to give a proper signal and 2) to make a proper observation that the turn can be made without endangering oncoming or overtaking vehicles.
The disinterested testimony of Boustany and Faulk corroborated plaintiff’s claim that she had given a proper signal. The trial court indicated he believed plaintiff’s witnesses. Therefore, a finding that plaintiff gave a proper signal is supported by the evidence.
We also believe there is a sufficient evidentiary basis to conclude that plaintiff made a proper observation that the turn could be made without endangering overtaking traffic. In this kind of case, often the only evidence that a proper observation was made will be the left-turning motorist’s testimony. Sometimes this testimony will be believed by the trier of fact (see Aetna Insurance Company, supra) and sometimes it will not (see Williams v. Inabnett, 345 So.2d 1294 (La.App. 3rd Cir. 1977)). In this case, the court obviously believed that plaintiff made a proper and careful observation of the following traffic, and that she concluded from this observation that the turn could be made safely.
Defendants argue that the trial court apparently completely ignored the testimony of Lona Sellers, plaintiff’s passenger, that she turned around and noticed defendant’s truck in the left lane five car lengths back. Defendants suggest that the court failed to recall Mrs. Sellers’ testimony because of the months that transpired between the beginning of the trial on February 20, 1980 (when Mrs. Sellers testified) and its conclusion on May 20, 1980.
We find defendants’ suggestion that the court failed to recall Mrs. Sellers’ testimony wholly without merit and unsupported by the record. We point out that the court vividly recalled the testimony given by Combs at an earlier time than that given by Mrs. Sellers. Hence we conclude that the court was fully aware of Mrs. Sellers’ testimony and all other testimony given during the earlier portion of the trial.
In response to the defendants’ contention that the court simply ignored Mrs. Sellers’ testimony, we note that Mrs. Sellers testified, under close questioning by the court, that her mother had already begun the left turn when she (Lona) noticed defendants’ truck five car lengths back in the left lane. This testimony does not negate the possibility that plaintiff had looked to her rear just before she began to turn, observing that no vehicles were attempting to pass.
The defendants argue that Combs began his passing maneuver before plaintiff crossed the center line into the left lane. The testimony of Faulk and Broussard support this contention. However, we do not believe that proof of this fact constitutes negligence on the part of the plaintiff, as defendants suggest, because the record does not establish that Combs had begun his passing maneuver before the plaintiff last looked to her rear.
Testimony by Broussard supports Combs’ later testimony that he began his passing maneuver only 400 feet or less before the accident site rather than Vfe to % of a mile before as he had previously testified. Accepting the overwhelming evidence that Combs was traveling at 65 miles per hour, then we take note of the fact that this speed is equal to a speed of 95.3 feet per second.[2] Thus, at his excessive rate of speed, Combs could have traversed the en *985 tire distance, from the point where he pulled into the left lane to the point of impact, in only four seconds.
Other evidence demonstrates that plaintiff may have required several seconds to execute her turn safely after she last inspected the traffic to her rear. Photographs of her car disclose that it was a rather large Buick Electra 225. Photographs of the accident site reveal Lona Sellers’ driveway to be a narrow gravel driveway flanked on either side by a deep ditch. The turn was attempted at dusk in a light rain. Plaintiff came to a complete stop before beginning her turn. Under these circumstances, it would be reasonable to assume that the turn might take several seconds to execute safely, even after the plaintiff last checked the rear.
We refuse to speculate as to when a left-turning motorist must make a final inspection to the rear to determine if the turn can be made safely. This is often a close factual issue. In this instance, the issue was decided by the factfinder in plaintiff’s favor and the evidence supports that decision.[3] The testimony of Lona Sellers is not compelling enough to warrant a reversal. Therefore, we affirm the trial court’s finding that Kenneth Combs was negligent and that Mrs. Elite Vallot was free of negligence.
DAMAGES
The trial court awarded plaintiff $65,-000.00 for general damages, $17,800.06 for special damages, and $15,000.00 for lost wages. The defendants would have us reduce the general damage award to an amount between $20,000.00 and $40,000.00, and eliminate the lost wage award altogether. On the other hand, plaintiff asks us to increase the general damage award to $150,000.00 and to increase the lost wage award to an amount between $25,946.66 and $46,498.98.
Since neither party argues that the special damages award of $17,800.06 is incorrect, that amount — which included $7,350.00 for the loss of plaintiff’s automobile, a hospital bill of $7,023.81, doctors’ bills, deposition fees, and other proven expenses incurred in connection with the accident — will be maintained.
As a result of the accident, plaintiff suffered a severe brain concussion that left a portion of her brain permanently scarred. She also suffered several pelvic fractures, and sustained various cuts and bruises. Plaintiff was hospitalized in Our Lady of Lourdes Hospital for a total of 22 days, with the first eight days being spent in the intensive care unit. She was finally discharged on January 25, 1979.
According to Dr. Ricardo Leoni, the neurosurgeon who treated plaintiff for her brain injury, Mrs. Vallot was confused and incoherent during her first few days in the hospital. Doctor Leoni testified that her brain would be permanently scarred due to the bruise on her brain caused by the accident. Following plaintiff’s discharge from the hospital Doctor Leoni saw her again on February 16, March 29, and May 10, 1979. He observed an abnormal reflex in the left leg which was attributable to the accident. This abnormality is permanent. He also commented that remarks that plaintiff made during these examinations seemed “inappropriate” for a woman her age.
Doctor Leoni also testified that an electroencephalogram taken on April 27, 1979, revealed that the electrical discharge to the brain was slower than normal. He said that this slowing of the brain can make one slow mentally. He testified that plaintiff’s injury was to her frontal lobe area. The frontal lobe affects a person’s reliability, emotional stability, ability to reason, and ability to maintain self control. According *986 to Doctor Leoni, an injury to the frontal lobe region can produce permanent residual damage.
The testimony of plaintiff’s sons and daughters, and of the woman who assisted plaintiff in her home during the early period of her convalescence in February and March, 1979, demonstrated that plaintiff was in constant pain during the entire time that she was in the hospital and during the first few weeks at her home after she was discharged from the hospital. This testimony also revealed that the accident transformed plaintiff into a completely different person.
Prior to the accident, plaintiff was a healthy and vigorous woman. She loved plants and had many of them in her home and yard. She took care of all her plants herself. She also did all of her own housework and was characterized by one of her daughters as being very self-sufficient and self-reliant. In addition, she sewed clothes for members of her family and cared for an elderly woman in Erath.
Since the accident, however, plaintiff has been a very nervous person who will not stay alone. She is a slow talker and is very forgetful. She can no longer care for her plants. She needs someone to help her with her housework, and she can no longer sew because she cannot concentrate. She does most of her in-town driving, but does so against the advice of her physician, Dr. Albert Sonnier. According to the medical evidence, all of plaintiff’s personality changes are attributable to her frontal lobe injury.
Defendants attempted to prove that many of these changes were attributable to hardening of the arteries, a vascular disease, but Doctor Leoni refuted this contention when he stated that an arteriogram performed on January 8, 1979, showed no evidence of hardening of the arteries, and he deemed it unlikely that the disease could have surfaced in only a few short months to cause such demonstrable personality changes.
While it may seem that a general damage award of $65,000.00 is low based on the severity and extent of plaintiff’s injuries, it must be remembered that plaintiff’s injuries required no surgery; plaintiff did not recall the accident nor the period during which she was hospitalized, and must therefore have been unaware of the fact that she was in pain during that time; plaintiff is able to walk unassisted and is able to perform some of her household chores; and plaintiff is able to, and does, drive her automobile without assistance.
After reviewing all evidence pertinent to the issue of general damages, we conclude that the general damage award is neither excessively high nor inordinately low and will therefore be neither reduced nor increased.
Both counsel cite cases in support of their arguments urging us to decrease or raise the award.[4] Yet our review of the facts and circumstances in those cases only reinforces our belief that the general damage award to Mrs. Vallot did not constitute a clear abuse of the much discretion vested in the trier of fact by La. C.C. Art. 1934(3). Reck v. Stevens, 373 So.2d 498 (La.1979). Consequently, the general damage award of $65,000.00 will be affirmed.
We also affirm the lost wages award of $15,000.00. At the time of this accident Mrs. Vallot was 68 years old. She testified at trial that since four months before the accident she had earned $3.00 per hour for 48 hours a week caring for Mrs. Emile Thibodeaux, an 86 year old woman living in Erath. Thus, she earned $144.00 per week. From the date of the accident, January 3, 1979, to the date of trial, May 20, 1980, *987 seventy-two weeks elapsed. Based on $144.00 per week, her lost wages from the date of the accident to the conclusion of the trial totalled $10,368.00. Assuming the court awarded plaintiff all her lost wages to the date of- trial, the court must have awarded her $4,632.00 for loss of future wages. He does not explain his reasons for doing so, yet we do not think this amount is beyond the range of his discretion.
Assuming, as counsel for plaintiff claims, that Mrs. Vallot had a work-life expectancy of 4.0 years at the age of 69, we do not think she is necessarily entitled to an award for loss of future wages for the duration of her work-life expectancy. An award based on one’s work-life expectancy may be proper at times but is not required.[5]
Plaintiff testified that this was the only job that she ever had, and that she had been engaged in this line of work for only four months prior to the accident. The woman plaintiff cared for was 86 years old and was not called to testify at trial. It is uncertain whether Mrs. Thibodeaux was still alive at the time of trial or whether plaintiff would have sought similar employment if Mrs. Thibodeaux had predeceased her. Given this unusual set of circumstances, we do not think the trial court committed manifest error by awarding plaintiff an amount for lost future wages of less than what her work-life expectancy would suggest be awarded.
DECREE
For the above and foregoing reasons the judgment of the district court is affirmed. Costs are assessed against the defendants.

AFFIRMED.

STOKER, J., concurs.

. Lawrence Harry, the Department of Transportation and Development traffic engineer for the district which included Vermilion Parish, testified that his records reveal that no striping of Highway 167 at the accident site occurred between January 3, 1979 and January 19, 1979.

. 65 mph X 5280 ft./mile -*• 3600 sec/m = 95.-33 feet per second.

. If the Petite and Aetna cases, supra, are correct that a left turning motorist has the right to assume that the following traffic will observe all the duties imposed upon it by law and com- ■ mon sense and is keeping a proper lookout, then the decision of the trial court in the instant case is eminently correct in light of the overwhelming evidence of Kenneth Combs’ negligence in failing to obey the speed limit and in failing to obey the prohibition against passing.

. Plaintiff cites Stanley v. Wiley, 325 So.2d 661 (La. App. 3rd Cir. 1975) and Arado v. Central National Insurance Company of Omaha, 337 So.2d 253 (La. App. 4th Cir. 1976), writ denied 339 So.2d 19. Defendant cites Dupas v. City of New Orleans, 361 So.2d 911 (La. App. 4th Cir. 1978); Wright v. Romano, 279 So.2d 735 (La. App. 1st Cir. 1973), writ refused 281 So.2d 757 and 758; Byrd v. Fulton, 259 So.2d 384 (La. App. 4th Cir. 1972); Trahan v. Girard Plumbing & Sprinkler Co., 299 So.2d 835 (La. App. 4th Cir. 1974); and Berry v. Gulf Coast Construction Company, 229 So.2d 368 (La. App. 4th Cir. 1969).

. See Lute v. City of Lake Charles, 394 So.2d 737 (La. App. 3rd Cir. 1981) and cases cited therein at footnote 4.