331 So.2d 529 (1976)
ST. PAUL FIRE & MARINE INSURANCE COMPANY
v.
Edward ROBERTS et al.
No. 10695.
Court of Appeal of Louisiana, First Circuit.
April 12, 1976.
Rehearing Denied May 24, 1976.
*531 A. Michael Dufilho, Baton Rouge, for defendants-appellants.
Kenneth E. Barnette, Baton Rouge, for plaintiff-appellee.
Before LANDRY, COVINGTON and PONDER, JJ.
LANDRY, Judge.
Defendants Asplundh Tree Expert Company, Asplundh Service Company and Asplundh Brush Control Company (Asplundh) and their liability insurer, The Aetna Casualty & Surety Company (Aetna), appeal from judgments rendered against them in this and the consolidated cases of John Ashley v. Edward Roberts et al., La.App., 331 So.2d 539, and Henry S. Martin v. Edward Roberts et al., La.App., 331 So.2d 541, all of which actions result from an automobile accident allegedly caused by Asplundh's employee Edward Roberts. In this present action Appellants seek reversal of judgment in favor of St. Paul Fire & Marine Insurance Company (St. Paul) for the sum of $10,000 paid by St. Paul to the injured plaintiffs in the *532 consolidated actions, which payment was made pursuant to the uninsured motorist clause in its policy covering the vehicle being driven by the plaintiff in the Martin action. We affirm the judgments rendered in each of these consolidated cases.
Mrs. Jonnie Sharon Ashley Martin and her husband Henry S. Martin brought suit against Roberts, Asplundh and Aetna for personal injuries sustained by Mrs. Martin, related medical expense and damages to the Martin vehicle which was being operated by Mrs. Martin at the time of the accident. John Ashley filed suit, individually and as Administrator of the estate of his minor daughter, Judith Ashley, against Roberts, Asplundh and Aetna for personal injuries sustained by said minor as guest passenger in the Martin car, and medical expense incurred in treatment thereof. While this action was pending, Miss Ashley reached majority and was substituted as party plaintiff as regards her personal injuries and medical expenses incurred subsequent to her attainment of legal age. Mr. Ashley remains a party plaintiff in that action with respect to his claim for medical expense incurred during his daughter's minority.
The accident occurred at approximately 7:00 P.M., August 8, 1971, on Highway 1028, a two lane black-topped roadway, about two miles north of Denham Springs and approximately one-tenth of a mile south of the junction of Highway 1028 and Highway 64. Roberts, driving his personally owned vehicle and accompanied by his friend, Elton Barnes, was proceeding northerly (away from Denham Springs). Mrs. Martin, driving her family car and accompanied by her sister, Judith Ashley, was proceeding southerly upon Highway 1028, having entered said roadway from Highway 64 a few moments before the accident. The highway was wet from recent rain, and a mist was falling at the time of the mishap. The impact occurred in a curve. The Roberts vehicle crossed the center line of the highway and struck the Martin vehicle in its proper lane of travel. It is undisputed that Roberts lost control of his vehicle, due either to wet brakes, mechanical brake failure, excessive speed or some other not fully explained cause. It suffices that the trial court found that the accident occurred solely because of Roberts' fault. This determination is not seriously questioned by Appellants and, indeed, could not be seriously disputed inasmuch as Roberts testified unequivocally that his vehicle was on the wrong side of the highway at the moment of impact. We find no difficulty in affirming the trial court's determination that Roberts was solely at fault.

ISSUES OF FACT
The prime issue in this litigation is Asplundh's alleged vicarious liability for Roberts's negligence, which issue must be resolved upon a finding of whether or not Roberts was acting within the scope and during the course of his employment by Asplundh at the time of the accident. In some respects the evidence on this pivotal issue is highly conflicting.
Asplundh's business is clearing and maintaining rights of way for utility companies, such as operators of pipelines, distributors of electrical power and telephone companies. Roberts was employed as a working foreman in charge of a crew consisting of two subordinates. The duties of the crew consisted of cutting and clearing trees, brush, overhanging limbs and other obstructions from rights of way. Each crew was provided with the necessary tools and equipment, consisting of axes, brush hooks, ropes, power saws and a truck equipped with a "chipper," a device which reduced limbs and brush for easy removal from job sites. As foreman, Roberts had control of the truck, which, according to company policy, he customarily kept at a service station that would furnish Asplundh weekly credit for gasoline and supplies. Roberts purchased all supplies from accommodating station owners and sent in *533 a weekly account to Asplundh who then mailed its check directly to the station operator in payment. The crews worked a normal 40 hour week, 8 hours daily, Monday through Friday. Roberts assembled his crew each morning at the site where the truck was kept and from there the men proceeded to the work site for the day. Roberts also entered on his weekly expense account, and thereby obtained reimbursement for, any personal funds that he may have expended for company purposes.
Roberts's crew was under the supervision of Asplundh's general foreman, William L. Beach, who resided in Denham Springs and who was in charge of approximately 10 such crews. Beach assigned Roberts's crew to a particular utility with whom Asplundh had a contract to clear right of way. At the time of the accident Roberts's was clearing rights of way for the telephone company whose officials designated the particular right of way on which Roberts worked. Except for choosing the work site, the utility official had no control over the crew. Ordinarily, Beach checked on each of his crews in the field about once or twice a week. On such occasions he checked the progress of the work, consulted with the foreman about problems encountered on the job, and inspected the tools and equipment the foreman had on hand. Although it was primarily Roberts's duty to keep his crew supplied with tools and equipment, Beach carried a supply of replacement tools and equipment such as hand saws, files, saw blades and ropes, in his station wagon while making his rounds and supplied these as needed to his foremen as an accommodation. Roberts was virtually on his own as to the manner in which he conducted his crew. He was free to improvise work methods within limitations. In effect, he was accountable to Beach only as to the amount of work performed to the satisfaction of the particular client involved. Roberts customarily checked with Beach approximately once each week, either by telephone or personal visit to Beach's residence, to discuss work progress and any problems that Roberts might have. Roberts had full authority to hire members of his crew. While he could lay off a crewman for disciplinary measures, Roberts could not permanently discharge a member of his crew without Beach's approval. The weekly expense reports which Roberts submitted were handled by Beach, who approved the reports before payment by Asplundh. It is conceded that each crew was supplied with a two cycle engine power saw used to cut trees, limbs and brush. Each such saw requires that the gas used as fuel also contain lubricating oil. It is also conceded that it was the duty of each crew foreman to see that he had sufficient gas and oil to operate his power saw.
Roberts, who lived in Ponchatoula, testified that he called Beach from his home on the Saturday morning before the accident, to discuss problems related to the progress of Roberts's crew on the telephone company job. During the conversation, Roberts mentioned to Beach that Roberts had purchased a case of Homelite power saw oil, a product marketed by the Homelite Saw Company whose saws were used exclusively by Asplundh's crews. Roberts mentioned that he had made a good buy of a case of oil from a dealer in Roseland and that he intended to use the oil in the power saw furnished his crew.
Roberts testified that he planned to use the oil to mix with the gas used in the power saw employed by his crew and that he expected to be reimbursed the cost of the oil as it was used by entering the amount each week on his expense account. Roberts also testified that when he mentioned the oil to Beach, Beach requested Roberts to bring one-half of the case to Beach's home because Beach needed the oil to deliver to other crews the following Monday. Roberts stated that he informed Beach that his (Roberts's) car was being repaired that day but that Roberts would bring the oil to Beach's home on Sunday if Roberts's car was ready by then. Roberts *534 readily conceded that he agreed to deliver the oil to Beach without expectation of compensation and purely as a favor to Beach. He explained that he thought it advisable to accommodate his employer and thus retain Beach's good will. Following delivery of his car on Sunday, Roberts rode around Ponchatoula for a time that afternoon with a friend, Elton Barnes, and asked Barnes if he cared to ride to Denham Springs where Roberts had to deliver some oil to Roberts's boss. Roberts testified further that he drove directly to Denham Springs on U.S. Highway 190. He left the oil at Beach's home with Beach's son since Beach was not at home.
Beach acknowledged Roberts's call and some discussion about a case of oil that Roberts had purchased; Beach testified, however, that he had understood the oil to be for a power saw which Roberts had purchased for his own personal use. Beach denied asking Roberts to bring him any of the oil and stated that if he had made such a request, he would have instructed Roberts to use the company truck for that purpose. Beach also admitted that Roberts left several cans of oil at Beach's home which Beach used in some personally owned equipment. Beach stated further that he did not use any of the oil in Asplundh's work and that quite some time after the accident, he had two cans remaining which he delivered to a representative of Aetna.
Roberts testified that he left Beach's home and decided to return to Ponchatoula via La. Highway 16 rather than return on Highway 190. He explained that on the way to Denham Springs he had seen several patrol cars on Highway 190, and since he had no driver's license and the safety inspection tag on his vehicle had expired, he decided to take a back road route for the return trip and reduce the odds of his being stopped by a patrol car. He proceeded along Highway 16 and turned onto Highway 1028 about three-fourths of a mile north of Denham Springs. He planned to proceed northerly on Highway 1028 until he reached Highway 64, where he would turn right, or east, and proceed along Highways 64, 1026 and 1027 to Walker. At Walker he proposed to take Highway 190 back to Ponchatoula. However, the accident occurred on Highway 1028 shortly before he reached its junction with Highway 64. Barnes testified by deposition taken December 19, 1974, because considerable difficulty was experienced in locating him for service of notice. He stated that as he and Roberts were riding around the afternoon of the accident, Roberts told him that Roberts had to go to Denham Springs to deliver some oil to Roberts's boss and asked Barnes to ride with him. Barnes also stated that Roberts drove directly to Denham Springs with no delays or detours and that Roberts left the oil at Beach's home with Beach's son because Beach was away at the time. Barnes contradicted Roberts's testimony that Roberts was en route to Ponchatoula at the time of the accident. He said Roberts was going to Baton Rouge to contact a cousin of Barnes whom Barnes would request to be Roberts's date for that evening. Barnes also stated that he was a musician and had a professional engagement in Albany at 8:00 P.M. that night, that his wife would accompany him on the engagement and that he would ask his cousin to come along as Roberts's date to listen to the music. Barnes recollected that the matter of Roberts's date was discussed while they were riding around in Ponchatoula before leaving for Denham Springs. He did not recall discussing the Baton Rouge trip while en route to Beach's home or after leaving there. He assumed that Roberts would turn west on La. 64, which route Barnes ordinarily took into north Baton Rouge to visit his cousin who lived near the airport.
Asplundh introduced the testimony of its employees and representatives Ray Spencer, manager of Asplundh's Louisiana operations; Beach and Mike Ballard, a foreman under Beach. In essence these witnesses *535 stated that it was Asplundh's policy to compensate all employees for overtime work and that Beach would not have directed Roberts to deliver oil to Beach's home on a weekend without reimbursement for the time involved and without instructing Roberts to use a company vehicle for the delivery. They further attested to company policy which dictated that each crew foreman secure his own oil for power saws and charge the company for the cost by adding such items to the foreman's weekly expense sheet. Beach testified that he did not normally distribute oil to crews for use in power saws, although he might have done so on rare occasions. Ballard testified that Beach never delivered power saw oil to Ballard on a job. Ballard also testified that he never worked on a weekend without being paid overtime. A former Asplundh foreman, W. A. Wallace, testified that on several occasions Beach asked him to perform certain tasks for Asplundh on weekends and after normal working hours, for which he received no compensation. He stated that on many occasions he delivered supplies to Beach and moved company trucks from one location to another without pay. In this regard, Roberts testified that he occasionally moved trucks for which services he was not paid.
Spencer and Beach attested to a strong company policy prohibiting employees from using personally owned vehicles for company business. However, Wallace and Roberts testified to use of their personally owned automobiles to transport employees to service stations for the purpose of moving company vehicles from one job location to another.
Spencer testified it was company policy that the crew foreman secure oil from the service stations where trucks were kept. Ballard affirmed this policy and added that Beach never distributed power saw oil to him. Contrarily, Roberts and Wallace stated that Beach delivered power saw oil to them in the field on numerous occasions.
In substance Beach and Ballard testified that Asplundh recommended that regular 30 weight non-detergent oil be used in the fuel for power saws as well as for oiling saw blades during operation. On this premise it is suggested that Beach would have had no reason to request Roberts to bring Beach special Homelite oil for distribution to the crews. It is conceded that the saw require a fuel mixture of gas and oil. Roberts and Wallace testified that the oil used in power saw fuel was the same or similar to outboard motor oil and that ordinary oil would not serve this purpose, that is, that the oil used in the saws had to be oil that would burn freely for the saws to operate properly. In addition, Roberts and Wallace stated that Asplundh's supervisors recommended Homelite oil or outboard motor oil for use in power saw fuel. Wallace recalled that he used ordinary oil in saws only when Homelite or outboard motor oil was unavailable because he got much better results from the saws when he used the proper oil in the fuel mixture. Ballard conceded that Asplundh's Foreman's Manual recommended use of Homelite oil in power saws but noted that a regular 30 weight non-detergent oil might be substituted.
Roberts's credibility was vigorously attacked because, at the accident scene, he prevailed upon Barnes to tell the investigating officer that Barnes was driving Roberts's automobile. Roberts readily conceded his participation in the deception and explained his conduct on the ground that he did not want to be charged with driving without a valid driver's license. However, the next day, Roberts and Barnes voluntarily sought the investigating officer and admitted their duplicity.
Roberts recalled that some time during the afternoon he and Barnes discussed the matter of a date but he did not recall their talking about it on the way to Denham Springs or after leaving there on the return trip. Barnes contradicted Roberts by testifying that the matter of a date for *536 Roberts was discussed on the way to Denham Springs and that at the time of the accident Barnes was directing Roberts toward Baton Rouge.
The trial court saw Roberts testify and, in his written reasons for judgment, attested to his favorable impression of Roberts's candor. The trial court obviously rejected Barnes's testimony because, among other things, Barnes readily acknowledged that Roberts was currently one of Barnes's worst enemies for reasons emanating from the accident.
We experience difficulty in accepting Barnes's testimony that Roberts was en route to Baton Rouge. The accident occurred at about 7:00 P.M. Barnes's cousin was unaware of Barnes's plans for her that night, it being Barnes's intent that she spend the night with Barnes's parents after listening to Barnes play music. Roberts would have had to drive to Baton Rouge, persuade the young lady to go to Albany, afford her opportunity to dress and pack for her overnight stay and then drive to Albany, a total distance of about 55 miles, by 8:00 P.M. so Barnes could fill his engagement.
Plaintiffs-appellees vehemently objected to the introduction of Barnes's deposition and its consideration by the trial court. It is contended that in a motion for summary judgment filed by defendants in the trial court, defendants admitted that Roberts was en route to Ponchatoula at the time of the accident. It is thus argued that Appellants are estopped from reversing this position and may not contradict their prior judicial admission. Plaintiffs also contend that the trial court erred in granting Appellant's motion to take Barnes's deposition because it was granted after Appellants formally closed their case for all purposes except the taking of further medical testimony.
Assuming the averments of Appellants' motion for summary judgment to be judicial admissions or confessions, La.C.C. Article 2291 provides that a judicial confession may be revoked if based on an error of fact. The record indicates that at the time Appellants moved for summary judgment they had uncovered no evidence of Roberts's intent to go anyplace except back to Ponchatoula after leaving Denham Springs. Being in error as to knowledge concerning this issue, Appellants were not judicially estopped by their declaration. J. H. Jenkins Contractors, Inc. v. Farriel, 261 La. 374, 259 So.2d 882; Modicut v. Rist, La.App., 98 So.2d 268, and authorities therein cited. Moreover, Plaintiffs have not shown that they were deceived or misled by Appellants' initial allegations, a prerequisite to Plaintiffs' plea of estoppel. J. H. Jenkins Contractors, Inc. v. Farriel, above; De Maupassant v. Clayton, 214 La. 812, 38 So.2d 791; Frazer v. Day, La.App., 292 So.2d 870.
We find no error in the trial court granting Appellants a continuance for the purpose of taking Barnes's testimony. The record reveals that Barnes's testimony was vital to Appellants' cause and that all possible diligence was exerted in attempting to secure his presence in court, but that service was not made on Barnes because he could not be located. Following the initial trial, Barnes was located and another subpoena issued for him to appear within the 90 day period fixed by the lower court. However, Barnes again disappeared before service could be made upon him. Based on information that Barnes was residing in the Tangipahoa-Livingston area, Appellants obtained two continuances for the taking of his testimony, the last until December 31, 1974. Ultimately Barnes was found and his deposition taken on December 19, 1974. Under these circumstances, we find that the trial court properly granted the continuances in question. See La.C.C.P. Article 1602.
The trial court accepted Roberts's testimony that the prime purpose of the trip to Denham Springs was to deliver oil to Beach, which Roberts was doing solely *537 in response to what he understood to be a request from his superior to do so. The trial court also concluded that Roberts was enroute to Ponchatoula at the time of the accident and had no intention of going to Baton Rouge, notwithstanding that a trip to Baton Rouge might have been discussed between Roberts and Barnes at some time during the afternoon. We find no error in these conclusions.

ISSUES OF LAW
Appellants contend that, accepting as true the facts found by the trial court, Roberts was not acting within the scope and during the course of his employment, primarily because of a total lack of control of Roberts's actions under the circumstances. Under our law, an employer is vicariously liable for injuries caused by his employees to third parties. This liability is imposed by La.C.C. Article 2320, which provides in pertinent part as follows:
"Art. 2320. Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed."
Pursuant to the foregoing codal authority, and the doctrine of respondeat superior which has been jurisprudentially grafted into our law, two essentials must be established before liability of an employer attaches, namely, (1) that a master-servant or employer-employee relationship existed between the employee tortfeasor and the employer, and (2) that the tortious act of the servant or employee was committed within the scope and during the course of his employment by the employer sought to be held liable. Blanchard v. Ogima, 253 La. 34, 215 So.2d 902, and authorities therein cited.
Appellants do not seriously question the existence of a master-servant relationship between Asplundh and Roberts. The record amply discloses the existence of that relationship and also establishes that, beyond doubt, Asplundh could have required Roberts to work overtime or on weekends if it so chose.
There is not, nor can there be, any hard and fast rule for determination of whether an employee is or is not acting within the scope and during the course of his employment. Each such instance must be determined in the light of its own peculiar facts and circumstances. Wright v. Romano, La.App., 279 So.2d 735; 53 Am. Jur.(2d) Master and Servant § 427; 60A C.J.S. Motor Vehicles § 452; Seavey, Law of Agency 148 (1964). The factors considered in making such a determination include the time the act was committed, meaning whether at a time the employee was obligated to perform a duty for his employer. Also to be considered are the place, circumstances and purpose of the act insofar as it may reasonably relate to or foster the employer's business. Additionally, the motive of the employee in performing the act is of paramount importance, as also are the questions of whether the act is one usually performed by employees engaged in similar capacities and whether the employer had reason to expect such an act would be performed by the employee. See 53 Am.Jur. (2d) Master and Servant § 427.
We have found that Beach requested Roberts to bring him several cans of oil for distribution to Asplundh's employees. Unquestionably, Beach possessed authority to require Roberts to work on a weekend or after ordinary working hours. While Roberts might have refused this particular request or demanded compensation, such action on his part may have jeopardized his position. The question posed is whether a servant who responds to his master's request to perform a work-related act during off duty hours, especially where the master may require after hours work of the servant, is acting within the scope and during the course of his employment the same as though the servant had been ordered to perform the task.
*538 The record indicates that Beach had sufficient control over Roberts's overtime activities so that Beach could have directed Roberts to bring the oil by a specific mode of transportation had Beach so elected. Beach did not so opt even though he was fully aware that Roberts intended to use his personal vehicle for the errand when the vehicle's repairs were completed. Under the circumstances, Roberts could reasonably assume that he at least had Beach's implied permission to effect the delivery by using his personal car. While the question of compensation for such services is certainly to be considered in a case of this nature, we do not deem absence of an agreement to compensate to be determinative of the outcome. We believe the prime issue is whether the servant is actually in the process of performing a duty related act.
Appellants also invoke the "going and coming rule" by contending that Roberts was not within the scope or during the course of his employment because he had completed the delivery and had no further responsibility toward Asplundh once his errand was finished. They analogize Roberts's conduct to that of an employee traveling to and from the site of his work or leaving work for meals, in which situations employees are not deemed to be within the scope or during the course of employment. Romero v. Hogue, La.App., 77 So.2d 74; Rollins v. New York Fire and Marine Underwriters, Inc., La.App., 225 So.2d 663. We are aware of innumerable authorities which apply the "going and coming rule" in instances where an employee is engaged to work in a particular plant or upon designated premises. In all such cases it is uniformly held that the master's concern with the employee begins when the employee arrives at the place of employment and terminates when the employee leaves.
The jurisprudence has developed an exception to the mentioned rule when the master calls an employee away from the employee's home or regular place of work to serve the master's purpose. We refer to the "specific errand rule" which holds the master liable for the normal risks inherent in the employee's travel in accomplishing such a special errand. We applied the "special errand rule" in Wright v. Romano, above and O'Brien v. Traders and General Insurance Company, La.App., 136 So.2d 852. In both the cited cases partial reliance was had on the fact that the employee received reimbursement of automobile expense. We do not deem remuneration to be an indispensable factor. We believe the master's liability attaches to an accident which occurs while the servant is in the process of executing a mission requested or directed by his master for the master's purposes.
Our brothers of the Third Circuit recognized the exception to the "going and coming rule" in Rollins v. New York Fire and Marine Underwriters, Inc., above, but did not apply the exception in that instance upon a purely factual determination.
Our application of the "special errand rule" finds support in its wide application in other jurisdictions. See Western Union Telegraph Co. v. Dubell, 3 Cir., 69 F.2d 149; Short v. United States, D.C.Del., 245 F.Supp. 591; Robinson v. George, 16 Cal. 2d 238, 105 P.2d 914; Wilson v. Steel Tank & Pipe Co. of Oregon, 152 Or. 386, 52 P.2d 1120; Kuehmichel v. Western Union Telegraph Co., 125 Minn. 74, 145 N.W. 788; Boynton v. McKales, 139 Cal.App.2d 777, 294 P.2d 733.
We hold that an employee on a special errand, pursuant to specific request or direction of his master, is within the scope and during the course of his employment from the time of embarking on the errand until his return or deviation from the mission for personal purposes. In this instance we find no deviation because Roberts's intent was to return to his home, although the return route may have been slightly longer than that by which the delivery was made. We conclude that Roberts *539 was acting within the scope and during the course of his employment at the time of the accident.

QUANTUM
It is not disputed that St. Paul paid Mrs. Martin and Judith Ashley $5,000.00 each pursuant to St. Paul's policy providing uninsured motorist coverage with respect to the Martin automobile. Said payment subrogated St. Paul to the claims of its said insureds and St. Paul is entitled to reinbursement in that amount.
The judgment of the trial court in favor of St. Paul and against Appellants Asplundh and Aetna, is affirmed, all costs of these proceedings to be paid by said Appellants.
Affirmed.