344 So.2d 675 (1977)
Edward Bryant JINKS, Individually, etc., Plaintiff-Appellee,
v.
James W. McCLURE et al., Defendants-Appellants.
No. 5840.
Court of Appeal of Louisiana, Third Circuit.
March 4, 1977.
*676 Camp, Carmouche, Palmer, Carwile & Barsh by James E. Williams, Lake Charles, for defendants-appellants Allstate and McClures.
Woodley, Fenet & Ranier by Edmund E. Woodley, Lake Charles, for defendant-appellant Hudson Engineering Co.
Norman L. Williams, Lake Charles, for plaintiffs-appellees Edward and John Jinks.
Mouton, Roy, Carmouche, Hailey & Bivens, John A. Bivens and Ralph E. Kraft, Lafayette, for defendant-appellee.
Thomas W. Sanders, Joseph W. Greenwald, Lake Charles, Jones, Jones & Alexander by J. B. Jones, Cameron, for plaintiff-appellee.
Richard B. Cappel of Raggio, Farrar, Cappel & Chozen, Lake Charles, for defendants-appellants.
Before WATSON, GUIDRY and FORET, JJ.
WATSON, Judge.
This suit was consolidated for jury trial and appeal with our docket No. 5841, Earl Joseph Chapman v. James W. McClure, et al., La.App., 344 So.2d 688 in which a *677 separate opinion has been rendered this date. Both suits arise from the same accident and involve the same defendants, James W. McClure, Larry D. McClure, Hudson Engineering Corporation, Allstate Insurance Company, A. H. Crain, John Paul Crain and American Mutual Liability Insurance Company. In the instant case, Earl Joseph Chapman, plaintiff in number 5841, is named as third party defendant. Plaintiff herein is Edward Bryant Jinks, individually, and as administrator of the estate of his minor child, John Kelvin Jinks.
The accident occurred in Cameron Parish, Louisiana on or about July 26, 1974. John Jinks was a guest passenger in a 1967 Ford pickup truck driven by Larry D. McClure and owned by James W. McClure, which was traveling west on Louisiana Highway 82. Approximately 10 miles west of Holly Beach, Louisiana, this truck collided with a 1974 Ford pickup truck owned and driven by Earl Joseph Chapman, which was proceeding east on the same highway. The collision occurred in an area of heavy smoke on the highway. It was alleged that Larry McClure, an employee of Hudson Engineering Corporation, was in the course and scope of his employment at the time of the accident. The McClure vehicle and the Chapman vehicle were both insured by Allstate Insurance Company. The owners of the property adjoining the highway, John Paul Crain and A. H. Crain, and their insurer, American Mutual Liability Insurance Company, were alleged to be responsible for the hazardous smoke condition and therefore liable for the damages resulting from the accident.
The jury concluded: that Larry McClure's negligence was a proximate cause of the accident; that Chapman was not negligent; that the Crains were not negligent; that Larry McClure was acting within the course and scope of his employment with Hudson Engineering Corporation at the time of the accident; and that John Jinks and Chapman were not guilty of contributory negligence and did not assume the risk of the accident. Edward Bryant Jinks' special damages were assessed at $1,175. John Kelvin Jinks was awarded special damages of $2,350, and general damages of $35,000. Earl Joseph Chapman was awarded damages of $50,000. Judgments were signed in accord with the verdicts of the jury. Hudson was given judgment against the McClures to indemnify it for any amount paid. Allstate's liability, as the insurer of the McClures, was limited by its policy provisions, to $10,000 for Chapman and $10,000 for Jinks. All court costs were assessed by the trial judge against the McClures and Allstate.
Appealing from the judgments are the McClures, Allstate Insurance Company, and Hudson Engineering Corporation.
Counsel for Hudson Engineering Corporation contends on appeal that the jury erred in finding Larry McClure to be acting in the course and scope of his employment with Hudson at the time of the accident; and that the jury's awards of damages to Jinks and Chapman are excessive.
Counsel for the McClures and Allstate contends that the jury erred in failing to find Jinks and Chapman guilty of contributory negligence and/or failing to find that they assumed the risk of the accident; that the jury awarded excessive damages; that the trial court erred in not finding the Crains liable; that the trial court erred in awarding the third party demand of Hudson against the McClures; and that the trial court erred in assessing all court costs against Allstate Insurance Company, as the insurer of the two McClures.
The facts, lengthy but largely undisputed, are best presented by a resume of the testimony of the various witnesses, which follows.
Larry D. McClure
Larry D. McClure, born September 17, 1957, resided in the home of his parents, Mr. and Mrs. James Wayne McClure, in League City, Texas, 32 miles south of Houston, when the accident occurred. Larry, then 16 years of age, had been a licensed driver for about 10 months. James McClure was a superintendent of Hudson Engineering Corporation and Larry was hired by Thomas *678 Granger, office manager of Hudson's Grand Chenier project, to work for the same company around June 20, 1974. Larry worked 48 hours a week from Monday to Friday as a carpenter's helper. Larry's boss was N. T. Ammons, the general foreman. James McClure was general supervisor. Larry McClure lived in his father's trailer on the job site. On the day of the accident, James McClure was in England and had been gone approximately one week. Generally, Larry rode from Cameron to Texas with his father in the Chevrolet Impala station wagon furnished by Hudson Engineering, but it had been left in Texas before the father's departure for England. The father always drove the station wagon and used a Hudson Engineering credit card for the gasoline. Larry's father customarily brought items such as nuts, bolts and pipe flanges from Houston to Grand Chenier. He also brought documents from Grand Chenier to Hudson's Houston office. On the date of the accident, Granger asked Larry to take some documents in a 11 by 14 inch brown envelope and a surveyor's "sighter" or transit to his father. Larry did not know what was in the envelope. Larry was driving his father's brown pickup. Larry had had one beer at John's Cafe east of Grand Chenier prior to the accident. It is approximately 25 miles from John's Cafe to Cameron and about 20 miles from Cameron to the site of the accident. It took 15 to 20 minutes to cross the ferry at Cameron. Larry stopped on Louisiana Highway 82 near Johnson's Bayou to pick up John Kelvin Jinks, who was holding a motorcycle tire. He then traveled about a mile and a half with Jinks as a passenger before reaching a patch of what appeared to be fog on the highway. Larry was driving approximately 50 miles an hour and had had little conversation with Jinks other than to ask where he was going to which Jinks replied "Johnson's Bayou". The fog or smoke was initially not very thick but it got worse; and the accident occurred approximately 50 yards into the area. Larry had slowed to a speed of about 30 or 40 m.p.h. Larry saw another truck coming head-on toward him; swerved to the right to miss it; and collided with the Chapman truck, which he had not seen prior to the collision. The truck which he avoided had its parking lights on and did not get involved in the accident. Larry did not have his lights on and his view was totally obscured by the smoke. The accident was head-on with the left side of Larry's truck and the left side of the other truck colliding. Larry's pickup came to rest across the middle of the road facing south. The Chapman pickup came to rest facing north toward Larry's truck with its back wheels in the ditch. After the accident, Jinks, who was cut above the eye and bleeding, said he was hurt. Larry's right wrist was injured.
Trooper Gerald B. Singer
State Trooper Gerald B. Singer investigated the accident between McClure and Chapman. Singer was notified at 5:07 p. m. and arrived at the scene at approximately 6:07 p. m. It was still daylight and the day was cloudy. There was dense, thick smoke across the road and Trooper Singer who was proceeding west on Highway 82 said it was approximately 100 yards from where he entered the smoke area to the scene of the accident. The wind was blowing from the south to the north. The smoke was patchy and varied in density. None of the parties were still present when Singer arrived but the vehicles were in place. According to the heavy damage inflicted on both vehicles, the left front of the McClure pickup collided with the left front of the Chapman pickup in the eastbound portion of Highway 82, south of the center line, in Chapman's lane of traffic. Singer could not accurately determine the exact point of impact because of the smoke, which was coming from a fire to the south. Chapman's pickup was headed east, toward Holly Beach and Cameron, and the McClure pickup was headed toward the Texas line. Singer questioned McClure and Chapman approximately an hour and a half after the accident at the Port Arthur Hospital. Larry McClure appeared to be fully conscious and said that he had been traveling between 45 and 50 but was not sure of his *679 location on the road. Larry was concerned about the truck, which had documents in it that he did not want lost or misplaced. Chapman said that he had been traveling at a very slow rate of speed. At least two other accidents occurred in the same smoke bank, which extended about a quarter of a mile.
John Kelvin Jinks
John Kelvin Jinks, born November 29, 1957, had trouble speaking clearly because of four teeth missing from his mouth as a result of the accident.[1] Jinks had come through the smoke ten or fifteen minutes prior to the accident with Dusty Sandifer operating Jinks' motorcycle and Jinks riding as a passenger, but the smoke had not been thick enough to obscure visibility. Sandifer was driving at a speed of 35 to 40 miles per hour. The motorbike had a flat, and Sandifer got a ride in another car while Jinks remained with his motorbike. Jinks then removed the tire and hitched a ride with Larry McClure, who told Jinks he was working at Hudson and was going home to deliver some papers. Three or four cars came out of the area of smoke and blinked their lights at Larry to indicate he should slow down. Shortly after they entered the smoke, Larry jerked to the right and barely missed a truck coming the other way; a split-second later they hit the Chapman truck. The accident happened too quickly for Jinks to warn McClure about the smoke. Jinks was thrown into the windshield. Fearing fire, he dove out the truck window and took off running. Jinks' sister, Carol Jean East, took him to the Port Arthur Hospital. Jinks was numb the first day but suffered considerable pain during subsequent days. At the time of trial, he was still having trouble with his neck, back and speech; he showed the jury scars left by the accident on his face. A temporary plate he wore to replace the missing teeth bothered him and was not replaced when broken two or three months before the trial. Jinks went to see Dr. Washburn, a plastic surgeon, for his scars and Dr. Schneider about his back. Jinks indicated a desire to have his scars removed.
Edward Bryant Jinks
Edward Bryant Jinks, a resident of Johnson's Bayou, is a widower and had raised his son, John Kelvin Jinks, alone from an early age. Edward Jinks is retired from employment with the state highway department. After the accident, his son was in shock and covered with blood. John has had trouble with his speech and with eating since the accident. It has caused him embarrassment in talking to people. Medical insurance paid for part of the son's medical treatment but some had to be paid out of the father's own pocket. John had not had his partial bridge fixed because it was uncomfortable and because of the additional expense. He has not had a permanent bridge made.
James Wayne McClure
James Wayne McClure, superintendent of construction for Hudson Engineering Corporation, was assigned the task of building the gas processing plant at the Transocean oil location in Grand Chenier, Louisiana. Larry received a summer job with the company as a carpenter's helper. Mr. McClure left for England on July 22, a Saturday, and told Larry that he could use the pickup truck to drive to Grand Chenier on Sunday and return on Friday. James McClure, a salaried employee, quite often made trips between the job site and the Houston office. On several occasions, he transmitted the bi-weekly record of the 50 employees on the Grand Chenier payroll and the receiving invoices for the equipment at the Grand Chenier job site to the Houston office. After the accident, Mr. McClure received a sealed envelope from the Houston office with a check and an expense statement, which were personal items for him. He did not know what else might have been sent by Larry and did not know how the items delivered by Granger to Larry on the Friday of the accident ultimately arrived in Houston. Larry's right wrist was fractured in the accident; he was disabled for four to *680 six weeks and did not have time to return to work before school started.
Thomas D. Granger
Thomas D. Granger, an employee of Hudson Engineering Corporation, was office manager at Grand Chenier in July of 1974. One of the duties of his job was to send documents and materials back and forth from Grand Chenier to the main office of Hudson in Houston. James McClure often carried such documents, because the mail service to Grand Chenier was poor. On the Friday of the accident, Granger gave Larry McClure an envelope that he would normally have given to his father. There were various forms in the envelope, which contained a package of mail; Granger particularly remembered a payroll summary, which summarized the employees' work for a two-week period, some receiving reports and field purchase orders. Receiving reports were sent to the Houston office so that the field invoices would be paid. Granger did not recall sending James McClure's personal check in the packet of documents and believed that all were company documents. Granger was in charge of the payroll and the material received at the Grand Chenier job site. Larry McClure was paid on an hourly basis for 48 hours a week consisting of four 10-hour days and one 8-hour day on Friday. He was considered a field employee whose duties did not relate to Granger's. Granger told Larry to take the papers to his father's house after work the Friday of the accident. Larry was not asked to take the packet to the Houston office because his father, who was returning on Sunday, knew where the various documents should go, and, the Hudson Houston office would have been closed by the time of Larry's arrival that Friday.
Charles "Dusty" Sandifer
Charles "Dusty" Sandifer, age 17 at the time of trial, was driving Jinks' motorbike with Jinks as a passenger prior to the accident. Sandifer drove through the smoke at a speed of around 30 to 40 miles per hour; the visibility was fair; the smoke, although thick in spots, not really that bad. A fire was burning on the south side of the road and in the adjacent pasture. After the motorbike had a flat, Sandifer caught a ride into Holly Beach with Billy Boy Griffith. Jinks stayed with his motorbike to try to get the flat tire off and Sandifer did not see him again until the next day in the Port Arthur Hospital. Sandifer spent two or three weeks in Jinks' home after the accident to help out. Although Jinks had had no scars on his face prior to the accident, he had the appearance of a "monster" (TR. 840) afterward. He also suffered with headaches; his back hurt; and his mouth and teeth gave him a great deal of trouble.
Earl Joseph Chapman
Earl Joseph Chapman, age 35, is married and has two children of his own and three step-daughters by his wife's previous marriage. Chapman's first wife was killed in an automobile accident and his wife Katherine's first husband drowned. At the time of trial, Chapman was employed on pipeline work. He finished the ninth grade in school and has no specialized job training. In July of 1974, when the accident occurred, Chapman was working at Johnson's Bayou. He was returning home to Holly Beach from Johnson's Bayou when the accident occurred around 5:00 or 5:15 p. m. Chapman had been through the smoke in the opposite direction prior to the accident but the visibility at that time was not bad. On the second trip, Chapman put his emergency flashers on. He pulled over to the shoulder of the road when the smoke got thick and then drove ahead a little bit when the wind cleared the smoke away. He was driving about five miles an hour and got hit when he pulled over to the shoulder of the road for the second time and stopped. His truck was entirely off the road on the right shoulder and his blinkers were on at the time. The impact knocked the rear wheels of the truck into the ditch and Chapman hit the steering wheel. His truck was a total wreck. The McClure boy said he had to get some papers out of his pickup. Chapman was initially taken to the emergency room of St. Mary's Hospital in Port Arthur where *681 x-rays were taken and he was told he needed to see a neurosurgeon. The intern told him that he could die from his injury if he were on the road more than an hour and also instructed the ambulance driver to that effect. The ambulance then took Chapman to Dr. Foster in Lake Charles at Memorial Hospital, where he arrived around 1:00 a. m. in the morning. Dr. Foster told Chapman the nature of his injuries and he was hospitalized. He was also treated by Dr. Cutrer for his nose and by Dr. Drez for his wrist and leg. Chapman said the spinal fluid leakage from his nose lasted for about three weeks and his nose was fractured. Chapman returned to his regular occupation as a truck driver and pipeline worker around the middle of September, approximately six weeks after the accident. He was aware at the time of his head condition but was not trained for anything else and needed to go back to work. He was and is worried about the danger of a blow to his head. It was stipulated that Chapman lost wages of $1500 for the six weeks that he did not work. His hospital bills totaled $816.84; the doctors' bills were $392; the ambulance bill was $140; the drug bill was $19.51; and his total medical expenses were $1,368.35. Chapman never saw the fire which was causing the smoke; there was no fire burning on the shoulder where he was parked. Chapman said he has occasional headaches as the result of his skull injury and his right wrist has continued to bother him when he holds something heavy.
Ms. Bonnie Conner
Ms. Bonnie Conner was employed by Hudson Engineering in July of 1974 as a secretary at the Grand Chenier job. She typed out the payroll records, progress reports, inter-office correspondence and other documents. She put address labels on the envelopes and then put them on Granger's desk so that he could attend to their delivery, although she sometimes had to take things to the post office.[2]
Gene Constance
Gene Constance, chief deputy with the Cameron Parish Sheriff's Department, held that job in July of 1974 and observed the area of smoke on Highway 82 where the grass was burning on the side of the road and inside a pasture.
John Paul Crain
John Paul Crain observed the smoke on the highway, which was coming from the south side as the result of a fire on the shoulder and in a pasture owned by him and his brother. Two of his ranch employees who would have been concerned with the pasture were Peter Sells and Murphy Romero, but he did not see either of them at the scene. That pasture, which consists of approximately 500 acres, is occasionally burned in August or September but never in July. A fire would not be set in a pasture south of the road unless there was a north wind. Pastures are generally burned around 10:00 or 11:00 in the morning and not in the late afternoon.
Peter E. Sells
Peter E. Sells, an employee of the Crains for 15 or 16 years, lives on the Crain Ranch between Holly Beach and Johnson's Bayou and takes care of the cattle. He was living there in July of 1974. He did not start the fire on the day of the accident and was working in Singer that day. When returning from Singer late in the afternoon, he observed a fire burning along the road and in the Crain pasture. They had never burned pasture in July because it was too early and usually burned in September or October.
Joseph Murphy Romero
Joseph Murphy Romero was employed by the Crains in July of 1974. He did not remember where he was working the day of *682 the accident but was not in the pasture in question because he did not know about the fire until his wife told him about it and young Jinks' accident. When Romero checked the pasture a few days later, he observed that the fire had been along the highway and had gone into the pasture. He testified that pastures are not generally burned in August.
Tommie Lou Clark
Tommie Lou Clark, a resident of the Crain ranch in Singer, keeps a daily record or diary, which noted that Sells and Mr. A. H. Crain arrived for lunch on the 25th of July and remained until after lunch on the 26th. She made these notes because she cooked lunch on both days. Lunch was generally late, sometimes as late as 2:00 p. m.
Billy Griffith
Billy Griffith, known as Billy Boy, is a deputy with the Cameron Parish Sheriff's Department. He picked up Dusty Sandifer prior to the accident, going through the smoke, which he described as thick but not dangerous, to do so. The fire was then burning on the shoulder of the road and in the roadside ditch. After the smoke had cleared, Griffith noted that the fire had burned through the ditch and across the fence into the pasture. Griffith had participated in working cattle and had never known of a pasture being burned as early as July. There was a fire near the same spot on the north shoulder of the road shortly before the trial.
Dr. John W. Andrepont
Dr. John W. Andrepont is a doctor of dental surgery, licensed by the state of Texas. He was called by Dr. C. D. Walther to see Jinks at Park Place Hospital in Port Arthur on July 29, 1974. Jinks was under sedation and had a number of sutures in his face. His mouth and face were very swollen; the left front tooth had been forcibly removed; three other front teeth could have been taken out with fingers, being chipped and loose in their sockets. Other teeth were chipped. The bone under Jinks' upper lip, the buckle alveolar bone, had several fractures. Dr. Andrepont removed the three loose teeth, smoothed out the fractured bone, packed it with gel foam and closed it with sutures so that the bone could heal, all under general anesthesia. Although the teeth that were removed had cavities, they could have been used during Jinks' lifetime, but are now permanently lost and cannot be restored. They should be replaced with a six-unit permanent fixed bridge from eye tooth to eye tooth, which would cost approximately $1200, making a total dental bill of $1460. Such a bridge would be the closest thing possible to Jinks' own teeth but not as desirable as his natural teeth. Jinks' mouth prior to the accident was in fair condition. In October, 1974, Jinks' mouth was not ready for a permanent bridge, since the bone does not heal for about a year. Jinks was fitted with a temporary partial bridge at that time and advised Dr. Andrepont that his father was not financially able to have a fixed bridge made. Ordinarily, the permanent bridge would have been installed in February, 1975. Two adjustments were made on the temporary bridge. Temporary bridges are generally very uncomfortable. When Dr. Andrepont saw Jinks in October, 1975, Jinks advised him that the partial had been broken and had not been used for three or four months.
Dr. Wesley W. Washburn, Jr.
In deposition, Dr. Wesley W. Washburn, Jr., a board certified plastic surgeon, testified that he saw John Jinks in his office on September 20, 1974, and observed scars on his forehead, scars on the upper eyelid and on the nose. At that time, it was too early to attempt a revision of these scars. In Dr. Washburn's opinion, they could be improved but not completely erased by future surgery. Because the scars were so numerous and extensive, surgery should be done under general anesthesia and his fee for this would be $450. Following the first surgery, after six months to a year, further surgery might be attempted. The initial surgery *683 would cost a minimum of $500 to $600 in hospital bills in addition to the surgical fee. At the time of Dr. Washburn's examination, the scars were still in the healing stage and could not be revised. Dr. Washburn felt there was no possibility that the scars might improve sufficiently on their own for cosmetic surgery to be contraindicated.
Dr. Charles D. Walther
Dr. Charles D. Walther testified by deposition as a specialist in general surgery. He saw John Kelvin Jinks in the emergency room at Park Place Hospital in Port Arthur on July 26, 1974, and admitted him to the hospital. The initial examination in the emergency room showed multiple lacerations of the face and loss of teeth. Jinks complained of some chest pain. The lacerations on the face were described as being as severe as one can have without serious tissue loss; the worst were on the nose and the right eyelid which was cut completely across from side to side. Dr. Walther removed a large jagged fragment of glass from the right eyelid and multiple small fragments in the face and attempted to fit the skin back together with sutures to minimize scarring. He described this procedure as analogous to fitting together a jigsaw puzzle. Jinks had fractures in the upper mandible where the teeth came out and Dr. Walther called in Dr. Andrepont to treat the oral surgery problems. During his fiveday hospitalization, Jinks received antibiotics, codein and aspirin for pain, and gelusel for his stomach. Jinks complained of hip pain but an x-ray showed no evidence of fracture and Walther diagnosed a strained hip. Walther testified on the basis of training in plastic surgery that the lacerations received by Jinks would leave residual scarring. On August 16, 1974, during an office visit, Walther recommended to Jinks that he consult a plastic surgeon for possible repair or revision of his scars during the following year. Dr. Walther noted a scar running the length of the right upper eyelid which was red and slightly swollen, small scattered scars about 20 in number, over the forehead, a large scar over the right nostril, multiple scars around the left nostril and a scar beneath the chin. He noted in particular that revision of the scar of the right nostril might be necessary. Jinks complained of tenderness from the fracture of his upper mandible but appeared to be doing fairly well. He also complained of backache and aching in his scapula or shoulder blade. Dr. Walther found these complaints in keeping with the nature of the injuries Jinks received in the accident. Walther identified his bill for treatment of Jinks in the amount of $250, in addition to another bill for the office visit. X-rays of Jinks' skull, chest, and left hip were made in the hospital. Walther stated that the amount of disfigurement from scarring could not be evaluated until a year had passed. As of the time of his deposition on October 7, 1975, the scars had improved as far as they would without plastic surgery.
Dr. David Drez, Jr.
Dr. David Drez, Jr., an expert in the field of orthopedic surgery, examined Earl Joseph Chapman on July 27, 1974, at the request of Dr. William Foster. Chapman stated that he had been involved in an automobile accident around 5:00 p. m. the day before. Chapman had facial pain, right wrist pain and pain on the inner aspect of the left tibia. X-rays showed a small chipped fracture of the tibia. On the right wrist, there was a small area of calcification, which probably resulted from a spraining injury to the wrist with loss of a fleck of bone. Dr. Drez felt that the injuries would result in pain and tenderness with limited activity for six to eight weeks. He said Chapman would have no significant functional disability, although, in his occupation as a truck driver, Chapman's injuries could cause a significant degree of pain.
Dr. William Franklin Foster
Dr. William Franklin Foster, an expert in the field of neurosurgery, examined Earl Joseph Chapman in Lake Charles Memorial Hospital on July 27, 1974, where he was transferred from the Port Arthur Hospital on referral from a Texas physician. Chapman, age 34, employed as a pipeliner, complained *684 of headaches. The physician in Port Arthur diagnosed a fracture of the frontal bone of the skull and a spinal fluid leak secondary to this injury. The patient also had pain in the right wrist and was somewhat confused although not in acute distress. Chapman had cerebral spinal fluid draining from the nose on both sides and edema or swelling around the nose and face. Chapman was hospitalized and placed on antibiotics within the brain for 10 days and then discharged from the hospital on oral antibiotics. Dr. Foster saw Chapman on August 1 when the spinal fluid leak had subsided and, on August 7, when it had resumed. Chapman was seen again on August 21 and continued on antibiotics. The spinal fluid leak had subsided spontaneously and Chapman was released to return to work on a trial basis. Dr. Foster testified that this type of open fracture is often fatal, since it involves a tear of the dura, the sack which holds the brain. If the leak does not spontaneously subside, a craniotomy, which is major and dangerous surgery of the brain, is required; such an operation often results in meningitis. The injury is also dangerous because it exposes the surface of the brain to all of the organisms and bacteria in the nasal cavity. Chapman was advised of the danger that the leak might resume at any time. Even minor trauma or a minor blow such as a slap in the face could precipitate a return of the leak. About ten per cent of patients develop seizure problems after this type of fracture and spinal fluid leak. Chapman is restricted from any contact sports or contact activities. Chapman was very eager to return to work and was released to do so but was advised to contact Dr. Foster immediately if he had any temperature elevation, seizure or other central nervous system problems. Although Dr. Foster did not feel that Chapman would have any further trouble, he testified that any recurrence, which could be precipitated by minor trauma, could be fatal.
Dr. William Kent Cutrer
Dr. William Kent Cutrer, an expert in the field of ear, nose and throat, saw Chapman on July 28, 1974, in consultation with Dr. Foster. Chapman had a displaced nasal fracture and cerebrospinal fluid rhinorrhea. A closed reduction of the nasal fracture was performed on July 31 under general anesthesia and Chapman was discharged from the hospital the next day with a small aluminum cast on the outside of the nose to protect it. The aluminum cast was removed on August 7. The swelling had gone down at that time and the nasal fracture was stable, although there was a spinal fluid leak from the nose.

ISSUES
The issues on appeal are:
(1) whether the Crains are liable;
(2) whether Larry McClure was in the course and scope of employment with Hudson;
(3) whether Chapman was contributorily negligent or assumed the risk of the accident; whether Jinks was contributorily negligent or assumed the risk of the accident;
(4) quantum of damages to Chapman and Jinks;
(5) indemnity to Hudson from the McClures; and
(6) court costs.
(1) LIABILITY OF THE CRAINS
The first issue is whether the Crains should be held liable, either on a negligence theory or under a theory of strict liability or legal fault as the owner of premises on which a fire was burning which caused harm. Loescher v. Parr, 324 So.2d 441 (La., 1975); LSA-C.C. arts. 2317, 2320 and 2322.
As to negligence on the part of either of the Crains, the jury correctly found that the record is devoid of evidence of negligence. In no way was the conduct of the Crains or their employees, Sells and Romero, sub-standard, blameworthy or negligent.
It is contended that, even in the absence of non-negligent conduct on the *685 part of the Crains, the damages in question resulted from a defect, here a fire, on their premises which created an unreasonable risk of harm to others. In the instant situation, no legal fault rests on the owners of the property for failure to prevent or guard against the fire because the defect or fire originated on the shoulder of the highway rather than in the Crains' pasture. This is established by the disinterested witness, Griffith. The inescapable conclusion is that the harm was caused by the fault of some third person, whoever caused the fire to start on the side of the highway. It was possibly a passerby with a careless cigarette. The fact that the grass on the shoulder caught fire and the fire spread to the Crain property does not make them liable. There is no evidence that the Crains could have prevented the spread of the fire. They were not responsible for the fire or defect but rather additional victims of it.
(2) COURSE AND SCOPE OF EMPLOYMENT
It is contended that the jury erred in finding Larry McClure to be in the course and scope of his employment with Hudson Engineering at the time of this accident. Counsel for Hudson maintains, correctly: that Larry was not driving a company automobile; the accident did not occur during the hours of his employment; Larry was not being paid wages during the trip; and no mileage or expenses were being paid for the trip. However, this case presents an unusual situation in that Larry McClure was acting on behalf of his father, a co-employee, and doing a service for Hudson which was customarily done by his father. When the senior McClure performed this duty, it is undisputed that he used a Hudson company car and credit card. The senior McClure was a salaried employee rather than an hourly employee.
Carrying of documents back and forth between Houston and Grand Chenier was one of the senior McClure's duties. He received the use of an automobile and payment of expenses for such trips. The jury could reasonably have found that Larry McClure was acting as a substitute for his father. The evidence, particularly that of Tommy Granger and Ms. Conner, establishes that Larry McClure was performing one of his father's duties with Hudson at the time of the accident. Hudson cannot escape liability merely because Larry McClure was performing the service rather than his father. Whether Larry was requested or ordered to perform the errand is not material, since it is inconceivable that an employee in his situation would have declined to do so. The question of whether an act is within the scope of an employer's business must be considered in the light of the particular circumstances, which indicate whether the act promotes the employer's business. There is a reasonable basis here for the jury's conclusion that Larry McClure was acting in the scope of his employment with Hudson at the time of this accident. We agree with the statement in the recent case of St. Paul Fire & Marine Insurance Co. v. Roberts, 331 So.2d 529 (La.App. 1 Cir. 1976) as follows:
"We believe the master's liability attaches to an accident which occurs while the servant is in the process of executing a mission requested or directed by his master for the master's purposes." 331 So.2d 538
Counsel for Hudson relies on Keen v. Pel State Oil Co., Inc., 332 So.2d 286 (La.App. 2 Cir. 1976) writ denied La., 333 So.2d 234 and Babineaux v. Lavergne, 321 So.2d 401 (La. App. 3 Cir. 1975).
Babineaux can be distinguished from the instant case. Crucial to that decision was the finding that the employee was performing an errand as a personal favor rather than because of employment, a situation not present here. In Babineaux, the trier of fact concluded that Lavergne was not acting within the course of his employment and this court found ". . . no error in the holding of the trial court . . ." 321 So.2d 404. As pointed out in Wright v. Romano, 279 So.2d 735 (La.App. 1 Cir. 1973) writ denied La., 281 So.2d 757, 758, each such case must be decided on its own facts. In Babineaux there was a reasonable evidentiary *686 basis on which to hold the employee not in the course of employment. Here, there is a reasonable evidentiary basis on which to affirm a contrary finding. An initial determination of the issue is not before us. Pierre v. Landry, 341 So.2d 891 (La., 1977).
Keen is also distinguishable on its facts from the instant case. There, the employee, Fountain, was not performing a service which was generally done in a company vehicle at company expense, as is the case here. We are also not bound by Keen. Judge Bolin's dissent, stating that the issue of whether an employee is performing a function of employment is best decided by trial on the merits, expresses our view of the question. Here, the jury found Larry McClure to be acting within the scope of his employment. That conclusion is not manifestly erroneous.
(3) CONTRIBUTORY NEGLIGENCE AND/OR ASSUMPTION OF RISK
The next issue is whether Jinks and Chapman were guilty of contributory negligence and/or assumed the risk of the accident.
Chapman testified that he was parked safely on the shoulder of the road with his flashers blinking when he was struck. His testimony was apparently believed by the jury and was supported to some extent by that of Larry McClure, who admitted that he did not know where he was located on the highway when the accident occurred. Chapman's testimony was not contradicted by that of any of the other witnesses; Trooper Singer could not determine the exact location of the point of impact because of the smoke. The fact that the wheels of Chapman's truck were in the ditch after the accident indicates that he was in all probability on the shoulder as he testified. While Chapman had been through the smoke in the opposite direction prior to the accident, he testified that the smoke at that time did not present a hazard. This testimony was confirmed by Sandifer, who testified that he could see well enough to proceed through the smoke safely on Jinks' motorcycle prior to the accident, by Jinks himself who was riding with Sandifer, and by deputy Billy Griffith.
As to the question of contributory negligence on the part of Jinks, the jury apparently believed his testimony that he did not have time to warn McClure about the smoke. As to having assumed the risk of the accident, his testimony, as well as that of Chapman, Sandifer and Griffith, was that the smoke did not present a hazard on his initial venture through it.
There is an ample evidentiary basis for the jury's conclusion that Chapman and Jinks were not guilty of contributory negligence and did not assume the risk of the accident.
(4) QUANTUM
No abuse of discretion is shown in the quantum of damages awarded Earl Joseph Chapman and Edward Bryant Jinks, individually, and as father of the minor, John Kelvin Jinks. LSA-C.C. art. 1934(3).
Earl Joseph Chapman was awarded $50,000. This sum included all items of special damages. Chapman, because of his lack of education, was forced to return to physical labor, despite the fact that any minor trauma could be fatal because of the unusual injury he received in this accident. Although the type of injury has small significance in determining the amount of damages awarded, Jenkins v. Dixie Rental Tools And Casing Crews, Inc., 283 So.2d 271 (La.App. 1 Cir. 1973) writ denied La., 285 So.2d 542, a worse injury than a potentially fatal tear of the brain sack secondary to an open skull fracture is difficult to envision. Chapman returned to work after six weeks because of a commendable desire to support his family but must live for the remainder of his life with the mental anguish of knowing that any slight trauma could result in his death. Loss of earnings cannot be calculated with mathematical exactitude and the jury here could well have considered the possibility that Chapman may suffer a recurrence of his injury. Coco v. Winston Industries, 341 So.2d 332 (La., 1976). Fear, *687 anxiety and mental anguish about a potential result of a physical injury is a proper element of an award of damages. Anderson v. Welding Testing Laboratory, Inc., 304 So.2d 351 (La., 1974).
The award of general damages to John Kelvin Jinks is not excessive. The jury had an opportunity to view the physical damage to this young man's face. Even plastic surgery will not restore Jinks' face completely. Such a facial disfiguration is a particularly sensitive matter to an adolescent. It is contended that the permanent bridge proposed by Dr. Andrepont would be superior to Jinks' natural teeth but this is not the testimony of that physician who said that nothing would restore John Kelvin Jinks' natural teeth since
". . . it's awfully hard to match the good Lord's work." (TR. 379)
Dr. Andrepont testified that the temporary bridge was a very uncomfortable thing. John Kelvin Jinks, because of financial inability to buy the permanent bridge, was forced to either wear the temporary bridge or go without it and be handicapped in his speech and eating during the period between the accident and trial. The jury here had the best opportunity of viewing John Kelvin Jinks and evaluating his injuries as well as his testimony. General damages
". . . involve mental or physical pain or suffering, inconvenience, the loss of gratification of intellectual or physical enjoyment, or other losses of life or lifestyle which cannot really be measured definitively in terms of money." Anderson v. Welding Testing Laboratory, Inc., 304 So.2d 352.
(5) INDEMNITY
It is contended that the trial court erred in giving Hudson judgment on its third party demand against the McClures for indemnity as to any amount paid. Since Hudson's liability is vicarious, Hudson is entitled to recover from the negligent party, Larry McClure, and his father, James McClure, who is responsible for the negligence of the minor, Larry, while residing in his household. LSA-C.C. art. 2318; Williams v. Marionneaux, 240 La. 713, 124 So.2d 919 (1960); Bewley Furniture Co., Inc. v. Maryland Casualty Co., 285 So.2d 216 (La., 1973).
(6) COURT COSTS
The trial court, in a post-trial ruling on court costs, held that Allstate and the McClures ". . . were cast with the total court costs by operation of law . . . and not by an application of the discretion of the trial judge."[3]
It is contended that the trial court erred in assessing all costs of court against Allstate, because Allstate tendered[4] its $10,000 policy limits at trial. The applicable article of the Code of Civil Procedure, 1920, provides:
"Unless the judgment provides otherwise, costs shall be paid by the party cast, and may be taxed by a rule to show cause. "Except as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable."
Although no reasons were assigned for holding the McClures and Allstate responsible for all costs, Hudson was apparently not cast for payment of costs because of its vicarious or secondary liability. Such a ruling might be within the trial court's wide discretion, but the court here specifically stated that costs were not fixed by discretion.
The Louisiana Supreme Court in Wooten v. Wimberly, 272 So.2d 303 (La., 1973) held that a party who is only vicariously liable is not solidarily liable with the principal debtor. As pointed out in the concurring opinion of Justice Tate,
"The two concepts are not mutually exclusive. A liability may be vicarious (a strict liability without fault, imposed by *688 statute), and it may also be solidary." 272 So.2d 309
This statement by Justice Tate is supported by Louisiana Civil Code art. 2106[5], which, as Professor H. Alston Johnson, III, points out in footnote 23 at 36 L.L.R. 380,
". . . envisions indemnification as a possible relationship between solidary obligors . . ..
The official revision comments under LSA-C.C.P. art. 1920 state in part:
"(c) Since the above article makes the imposition of costs discretionary with the court, the provision of Art. 549, Code of Practice of 1870, excepting from the general rule cases where compensation has been allowed or real tender made, is unnecessary."
This court has authority under LSA-C. C.P. art. 2164 to tax costs:
". . . as in its judgment may be considered equitable."
It is not equitable for Allstate to bear the costs of the extensive litigation on the question of whether Larry McClure was in the course and scope of his employment with Hudson at the time of this accident.
A party may be cast for court costs, even though that party has no liability. Britt v. Merritt, 219 La. 333, 53 So.2d 121 (1951). Court costs need not be assessed against one primarily liable. Ogaard v. Wiley, 325 So.2d 642 (La.App. 3 Cir. 1975). The trial court erred in holding that the McClures and Allstate were liable for all costs as a matter of law. In the interest of fairness, Hudson is cast for one-half of all costs, both at trial and appeal; Allstate, Larry McClure and James McClure are cast for the other one-half.

CONCLUSION
For the foregoing reasons, the judgment of the trial court herein is amended to tax one-half of the costs of trial to Hudson Engineering Corporation. The judgment of the trial court is otherwise affirmed.
All costs of appeal are taxed one-half to Hudson Engineering Corporation and one-half to James McClure, Larry McClure and Allstate Insurance Company.
AMENDED AND AFFIRMED.
GUIDRY, J., concurs and assigns written reasons.
GUIDRY, Judge (concurring).
I concur in the finding that the Crains are not strictly liable under LSA-C.C. Art. 2317 and Loescher v. Parr, 324 So.2d 441 (La. 1975), but on the ground that they were not owners or guardians of a defective thing.
I concur in the finding of liability on the part of Hudson Engineering Corporation only because of the strict rule of appellate review as announced in Canter v. Koehring Company, 283 So.2d 716 (La.1973).
NOTES
[1] The court reporter repeatedly stated that she had difficulty in understanding him.
[2] In an offer of proof, Ms. Conner added that, every week or every other week, James McClure would carry invoices, receiving reports, payroll time sheets and progress reports from the Grand Chenier job site addressed to the Houston office of Hudson Engineering. Granger made the decisions as to what would be transmitted.
[3] Filed in this court on February 10, 1977, by stipulation of all parties.
[4] The record does not reflect that Allstate tendered its policy limits or paid any sum into the registry of the court.
[5] LSA-C.C. art. 2106:

"Art. 2106. If the affair for which the debt has been contracted in solido, concern only one of the coobligors in solido, that one is liable for the whole debt towards the other codebtors, who, with regard to him, are considered only as his securities."